583 F.2d 1242
 Doris E. JOHNSON, Edna Sylvester, Joseph L., Jr. and Mary
Tunstall, and Joseph Massey, on behalf of
themselves and all others similarly situated
v.
Robert F. KELLY, Individually and as Prothonotary of the
Court of Common Pleas of Delaware County, Court House,
Media, Pennsylvania, and Grace Building Company, Inc.,
George and Rye Gold, Robert Alden, Inc., and Curtis Building
Co., Inc., on behalf of themselves and all others similarly
situated.
Appeal of Doris E. JOHNSON and Joseph Massey, on behalf of
themselves and the class which they purport to represent.
 No. 77-2225.
 United States Court of Appeals,
Third Circuit.
 Argued June 22, 1978.
Decided Sept. 29, 1978.
 
 David A. Scholl, Alan H. Kleinman, Community Legal Services, Inc., Philadelphia, Pa., for appellants.
 Alfred O. Breinig, Jr., Jenkintown, Pa., for appellee.
 Before SEITZ, Chief Judge, ALDISERT and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Plaintiffs appeal from an order of the district court dismissing their constitutional challenge to the validity of tax sales conducted against their properties pursuant to the Pennsylvania County Return Act, Act of May 29, 1931, P.L. 280, §§ 1-21, as amended, 72 P.S. §§ 5971a-t. The district court, concluding that it was constrained from reaching the merits of plaintiffs' claim, dismissed the complaint "in deference to the principles explained in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny . . . ." Johnson v. Kelly, 436 F.Supp. 155, 158 (E.D.Pa.1977).
 
 I. FACTUAL BACKGROUND
 
 2
 The named plaintiffs in this proposed class action, Doris E. Johnson, Joseph Massey, and Joseph and Mary Tunstall, are former owners of residential property located in Delaware County, Pennsylvania, that has been sold at a County Treasurer's tax sale for the alleged nonpayment of local property taxes. Defendants Grace Building Company, Inc. and Curtis Building Company, Inc. are the tax sale purchasers of the properties in question; the third named defendant is E. Jack Ippoliti, Prothonotary of the Delaware County Court of Common Pleas (substituted for Robert F. Kelly, who occupied that office at the time the complaint was filed).
 
 
 3
 The factual setting of this case with regard to each of the named plaintiffs is set out at some length in the district court's opinion. See Johnson v. Kelly, supra at 159-61. Each of the three controversies developed around a common factual pattern which, given the district court's disposition of the case below, need only be briefly summarized here. The tax sales of the plaintiffs' property were conducted because of their alleged nonpayment of Delaware County property taxes. The parties stipulated that the Johnson and Massey properties were purchased by Grace Building at a 1969 tax sale for $198.31 and $268.06, respectively. The Tunstalls' property was purchased by Curtis Building at a 1968 tax sale for $424.44. The purchase prices were equivalent to the amount of the alleged tax delinquencies and each property had a fair market value far greater (ranging from $8,000 to $30,000) than the tax sale purchase price. The Tunstalls continued to pay local property taxes to Delaware County from 1968 until 1971, but those payments were not credited against the 1966 delinquency which had triggered the tax sale.
 
 
 4
 The County Return Act, which governed the sales, requires that the record owners of such property be notified prior to the date of sale by certified or registered mail, and by newspaper publication. The Act also provides that failure of the owner to receive personal notice of the sale shall not serve to prejudice the title acquired by a tax sale purchaser as long as the notice was properly sent. See 72 P.S. § 5971g.
 
 
 5
 All of the plaintiffs here claim that they have no recollection of receiving any notices sent to them by the Delaware County Treasurer's office, and that they did not see the newspaper advertisements regarding the tax sales of their properties. The plaintiffs contend, therefore, that they remained unaware that their properties had been sold until the tax sale purchasers, who are defendants here, instituted state court actions to quiet title and obtain possession. Consequently, none of the plaintiffs exercised his statutory right to redeem the properties within two years of the date of the tax sale. See 72 P.S. § 5971 O. It was the pendency of the aforementioned quiet title actions in the state courts of Pennsylvania, presently at various stages of litigation,[1] that caused the district court to dismiss plaintiffs' federal complaint on Younger grounds.
 
 
 6
 The plaintiffs filed a complaint in federal court on October 21, 1975, which requested, inter alia, a declaratory judgment that all Delaware County tax sales held pursuant to the County Return Act[2] are unconstitutional, as violative of the due process guarantee of the fourteenth amendment; injunctions preventing tax sale purchasers from commencing or proceeding with state court actions to quiet title to properties purchased at such tax sales and preventing defendant Ippoliti, in his capacity as Prothonotary of the Delaware County Court of Common Pleas, from filing those actions; and an order setting aside the tax sales of the properties of each of the named and class plaintiffs who pay to the Delaware County Treasurer all taxes, penalties, interest, and costs for which the properties were sold or which are presently due.
 
 
 7
 The plaintiffs' principal constitutional contention is that the County Return Act violates due process by failing to require a judicial determination of the accuracy of an alleged tax delinquency prior to the County's conducting a tax sale, and by failing to require notice by personal service to a property owner whose land is scheduled to be sold for taxes.
 
 
 8
 The district court, after hearing, dismissed the complaints of all three named plaintiffs on Younger grounds and thus did not reach the issue of class certification. Johnson v. Kelly, supra at 158 & n.3. Plaintiffs Johnson and Massey, on behalf of themselves and the class they seek to represent, appeal from that order.
 
 II. DISCUSSION
 
 9
 At the outset of its discussion of the legal issues presented here, the district court noted that "(t)here are two judicially created abstention doctrines which are potentially applicable in this case." Id. 162 (footnotes omitted). The court concluded that the first of these doctrines Pullman abstention, See Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) is inapplicable to the factual allegations and constitutional claims presented in this case. Johnson v. Kelly, supra at 162. However, after considering the contours of the second doctrine, formulated by the Supreme Court in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, the district court concluded that it "must abstain from reaching the merits of the controversy and order that the complaint be dismissed." Johnson v. Kelly, supra at 167 (footnotes omitted). It is the application of Younger principles to this federal action that is the subject of this appeal.
 
 
 10
 In Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court reversed the order of a three-judge district court that had enjoined the Los Angeles County District Attorney from prosecuting the plaintiff, Harris, who had been indicted in a California state court on a charge of violating the California Criminal Syndicalism Act. The Court held that the district court's judgment "must be reversed as a violation of the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." 401 U.S. at 41, 91 S.Ct. at 749. (footnote omitted).
 
 
 11
 Justice Black, writing for the Court, articulated the following principles as the "primary sources" of that national policy. First, he referred to "the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." Id. 43-44, 91 S.Ct. at 750. This principle he found to serve the policies of preventing erosion of the role of the jury in criminal cases, and to avoid a duplication of legal proceedings and legal sanctions. Id. 44, 91 S.Ct. 746. In addition, Justice Black found this principle of equitable restraint with respect to criminal prosecutions to be "reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." Id. This principle, which Justice Black felt was embodied in the phrase "Our Federalism," is a concept which represents "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." Id.
 
 
 12
 Several years passed before the Supreme Court decided that the principles articulated by Justice Black in Younger could be applicable to federal court intervention in a state civil proceeding. In Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), the Court created a limited "civil counterpart" to the Younger doctrine, but made "no general pronouncements upon the applicability of Younger to all civil litigation." 420 U.S. at 607, 95 S.Ct. at 1209. In Huffman, the sheriff and prosecuting attorney of Allen County, Ohio, appealed the order of a three-judge district court that had permanently enjoined the execution of a state court judgment closing the plaintiff's theater for one year for displaying obscene films. The state court had issued its judgment in a civil enforcement proceeding brought against the plaintiff under the Ohio public nuisance statute. Rather than appealing the state court's order within the Ohio court system, the theater owner filed suit in federal district court seeking an injunction against its execution. The district court found the statute to constitute an overly broad prior restraint on first amendment rights and granted the requested injunctive relief. Id. 595-99, 95 S.Ct. 1200.
 
 
 13
 In Huffman, Justice Rehnquist suggested that the comity and federalism strand of Younger is applicable to a civil proceeding "quite as much as it is to a criminal proceeding." Id. 604, 95 S.Ct. at 1208. He based this conclusion on four aspects of federal court interference with a pending state judicial proceeding that raise federalism concerns: 1) the prevention of state effectuation of its substantive policies; 2) the prevention of the state court from providing a forum competent to vindicate constitutional objections interposed against those policies; 3) the creation of duplicative legal proceedings; and 4) the creation of a negative reflection upon the state court's ability to enforce constitutional principles. Id. Justice Rehnquist recognized, however, that the Younger doctrine also rests upon the reluctance of courts of equity to interfere with criminal prosecutions, and that "(s) trictly speaking, this element of Younger is not available to mandate federal restraint in civil cases." Id.
 
 
 14
 Nonetheless, Justice Rehnquist found the public nuisance proceeding at issue in Huffman to be "more akin to a criminal prosecution than are most civil cases," Id., leading him to conclude that Younger principles should be applied in that case. He also suggested that the factors that rendered the public nuisance proceeding "akin to a criminal prosecution" might not be presented in "civil litigation involving private parties." Id. Among those factors he listed the fact that the state was a party to the civil nuisance proceeding, and that the proceeding was in aid of, and closely related to, criminal statutes regulating the dissemination of obscene materials. "Thus," he concluded, "an offense to the State's interest in the nuisance litigation is likely to be every bit as great as it would be were this a criminal proceeding." Id. (citation omitted).
 
 
 15
 The Supreme Court has further defined the scope of the Huffman "civil counterpart" to Younger in two more recent decisions. The first was Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), in which judges of the New York state courts appealed from an order of a three-judge district court enjoining the continued operation of New York's statutory civil contempt proceedings. Vail, the federal plaintiff, was a judgment debtor who failed to comply with a creditor's subpoena requiring him to attend a deposition intended to provide the creditor with information relevant to the satisfaction of the judgment. The plaintiff also failed to appear before the Dutchess County Court to answer an order requiring him to show cause why he should not be held in contempt. Following his refusal to pay a fine, Vail was arrested and jailed. Shortly after his release Vail commenced a federal action against the judges of the state courts, challenging the constitutionality of the civil contempt proceedings. He brought the action on behalf of himself and other judgment debtors, some of whom were subject to pending contempt proceedings. 430 U.S. at 328-33, 97 S.Ct. 1211.
 
 
 16
 The district court in Juidice decided that Younger principles were not applicable to the pending civil contempt proceedings because they were not tied to the state's enforcement of its criminal laws. Id. 333 & n.10, 97 S.Ct. 1211, 1217. Justice Rehnquist, writing for the Court, stated that "the 'more vital consideration' behind the Younger doctrine of nonintervention lay not in the fact that the state criminal process was involved but rather in 'the notion of comity,' . . ." that was first articulated by Justice Black in Younger itself. Id. 334, 97 S.Ct. at 1217. He went on to hold that "federal-court interference with the State's contempt process is 'an offense to the State's interest . . . likely to be every bit as great as it would be were this a criminal proceeding,' " Id. 336, 97 S.Ct. at 1217 (citation omitted), and that such interference with the State's legitimate activities could also be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles. Id.
 
 
 17
 Justice Rehnquist acknowledged that the contempt process enjoined by the lower court in Juidice served to vindicate the private interests of competing litigants, but he emphasized that ". . . its purpose is by no means spent upon purely private concerns. It stands in aid of the authority of the judicial system, so that its orders and judgments are not rendered nugatory . . .. " Id. 336 n.12, 97 S.Ct. at 1217 (citations omitted).
 
 
 18
 Once again, the Court in Juidice "save(d) for another day the question of 'the applicability of Younger to all civil litigation .. . .' " Id. 336 n.13, 97 S.Ct. at 1218.
 
 
 19
 The most recent opinion in which the Supreme Court has considered the boundaries of the Younger doctrine is Trainor v. Hernandez, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977). In Trainor, a three-judge district court held that provisions of the Illinois Attachment Act were violative of the due process clause of the fourteenth amendment, and the court enjoined all Illinois court clerks and sheriffs from issuing or serving attachment writs. The plaintiffs who instituted the lawsuit were themselves defendants in a state court civil suit brought by the Illinois Department of Public Aid, in which it was alleged that they had fraudulently concealed assets while receiving public assistance, and which sought the return of money alleged to have been wrongfully received. The Department had also secured a writ of attachment against the plaintiffs' property, which the plaintiffs did not seek to challenge in the pending state proceedings. 431 U.S. at 435-38, 97 S.Ct. 1911.
 
 
 20
 The district court in Trainor ruled that Younger principles did not apply to the state court attachment proceedings because the Attachment Act did not provide a cause of action exclusively to state officials, as had been the case with the public nuisance statute at issue in Huffman, and because attachment proceedings were not necessarily "quasi-criminal" in nature, although they happened to be related to the state's enforcement of criminal law in that case. Id. 439, 97 S.Ct. 1911.
 
 
 21
 Justice White, writing for a five member majority of the Supreme Court, reversed that ruling. He phrased the question to be resolved in Trainor as follows:
 
 
 22
 . . . More precisely, when a suit is filed in a federal court challenging the constitutionality of a state law under the Federal Constitution and seeking to have state officers enjoined from enforcing it, should the federal court proceed to judgment when it appears that the State has already instituted proceedings in the state court to enforce the challenged statute against the federal plaintiff and the latter could tender and have his federal claims decided in the state court?
 
 
 23
 Id. 440, 97 S.Ct. at 1916.
 
 
 24
 The Court held that its earlier decisions in Younger, Huffman and Juidice controlled the resolution of that question. In holding Younger principles applicable to the factual situation presented in Trainor the Court emphasized the following factors: an action was pending against the federal plaintiffs in state court when they filed their federal suit; the state action was a suit by the state and the challenged writ of attachment issued as a part of that action; the state was a party to the suit in its role of administering its public-assistance programs; the state's suit and the accompanying writ of attachment were intended to vindicate the important state policy of protecting the fiscal integrity of those programs; and the state authorities had had the option of vindicating that policy through criminal prosecutions. Id. 444, 97 S.Ct. 1918. Based on these factors the Court was able to conclude that "the principles of Younger and Huffman are broad enough to apply to interference by a federal court with an ongoing civil enforcement action such as this, brought by the State in its sovereign capacity." Id. (footnote omitted).
 
 
 25
 Thus, in Trainor the Court placed particular emphasis on the fact that the district court's injunction had interfered with pending state court proceedings in which the state, acting in its sovereign capacity, was pursuing the enforcement of its policies:
 
 
 26
 . . . This disruption of suits by the State in its sovereign capacity, when combined with the negative reflection on the State's ability to adjudicate federal claims that occurs whenever a federal court enjoins a pending state proceeding, leads us to the conclusion that the interests of comity and federalism on which Younger . . . primarily rest(s) apply in full force here. . . .
 
 
 27
 Id. 446, 97 S.Ct. at 1919.
 
 
 28
 In Trainor Justice White reiterated that the Court was not presented with an occasion to decide whether Younger principles apply to all civil litigation. Id. 444 n.8, 97 S.Ct. 1911.
 
 
 29
 Justice Blackmun, who represented the deciding vote in Trainor, wrote a separate concurring opinion in which he stated that, "I, too, find significant the fact that the State was a party in its sovereign capacity to both the state suit and the federal suit." Id. 449, 97 S.Ct. 1921 (Blackmun, J., concurring).
 
 
 30
 It is with this background in mind that we turn to the district court's application of the Younger principles of equitable restraint to this case.
 
 
 31
 The district court quite properly rejected the plaintiffs' argument that the Younger doctrine is applicable only when the pending state proceedings sought to be enjoined are criminal or "quasi-criminal" in nature. See Johnson v. Kelly, supra at 163-65. The Supreme Court's decisions in Juidice and Trainor make clear that that factor is no longer to be given controlling significance. However, plaintiffs' contention that Younger principles are inapplicable to pending state proceedings to which the state is not a party raises a concern that is worthy of close attention given the repeated emphasis of that factor by both Justice White and Justice Blackmun in Trainor.
 
 
 32
 The district court cited Juidice and four lower court opinions for the proposition that "abstention has been held proper even where the state civil proceeding involves a dispute between private parties . . . ." Johnson v. Kelly, supra at 165. It is true that the pending civil contempt proceedings impermissibly enjoined by the district court in Juidice were triggered by the attempt of a private litigant to satisfy a judgment. Nonetheless, as noted above, Justice Rehnquist took pains to point out that the civil contempt power serves important public concerns as well as those of private litigants. As he fully recognized, "The contempt power lies at the core of the administration of a State's judicial system . . . ." Juidice v. Vail, supra, 430 U.S. at 335, 97 S.Ct. at 1217 (citation omitted). It is through the exercise of that power that the State "vindicates the regular operation of its judicial system . . . ." Id.
 
 
 33
 Although technically speaking it is true that the state was not a party to the proceeding enjoined by the district court in Juidice, it is readily apparent that an injunction against state court judges, preventing them from exercising state-authorized judicial powers vital to the administration of justice, implicates the federalism and comity strand of the Younger doctrine much more severely than would an injunction here preventing private litigants from pursuing their quiet title actions in state court. In exercising his power of civil contempt, a state court judge becomes a real party to the proceedings in a unique way.
 
 
 34
 Moreover, it was the very constitutionality of the state court judges' exercise of their powers that was the underlying issue in the plaintiffs' federal suit in Juidice. Here, the underlying issue is the constitutionality of the procedures governing tax sales conducted pursuant to the County Return Act; the plaintiffs have sought to enjoin the pending quiet title actions merely to retain possession of their property until the underlying constitutional claims can be adjudicated. Therefore, any negative reflection upon the state court's ability to adjudicate these constitutional challenges, which might be created by a federal injunction restraining the pending state proceedings, would be much more attenuated than was the case in Juidice. There state court judges were to be prevented from adjudicating the constitutionality of a state statute defining the scope of their own powers. See Juidice v. Vail, supra at 336, 97 S.Ct. 1211.
 
 
 35
 The unique factors present in Juidice have led one commentator to conclude that the Court's opinion should not be construed as extending the Younger doctrine to more typical cases involving pending state litigation between private parties:
 
 
 36
 Indeed, contempt proceedings of the type at issue in Vail form a poor basis for further generalizations and may in fact be sui generis. While not part of the normal criminal process, they lead to penal sanctions of a type rarely imposed except to further important state interests. While triggered by private parties, they impose few burdens without the significant involvement of the judge. . . .
 
 
 37
 Developments in the Law Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1310-11 (1977).
 
 
 38
 While failing to recognize the unique circumstances involved in the civil contempt proceedings at issue in Juidice, the court below also minimized the relevance of the Court's more recent opinion in Trainor to the issue presented here. See Johnson v. Kelly, supra at 165. As noted above, Justice White emphasized several times during the course of his majority opinion that the state, acting in its sovereign capacity, had instituted the civil enforcement proceedings sought there to be enjoined. See Trainor v. Hernandez, supra at 444, 446, 97 S.Ct. 1911. That emphasis takes on added significance given that Justice Blackmun's deciding vote was also influenced by that fact. Id. 449, 97 S.Ct. 1911 (Blackmun, J., concurring).
 
 
 39
 A close reading of the Trainor opinion persuades us that, outside the special context of a challenge to civil contempt proceedings, the Younger doctrine should not be extended to cases in which the state proceedings have not been initiated by the state itself.[3] We are supported in this view by the Supreme Court's recent admonition that, " 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. . . .' " Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976), Quoting County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959); McKnight v. SEPTA, 583 F.2d 1229, 1241 (3d Cir. 1978).
 
 
 40
 It cannot be gainsaid after Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), that the district court has jurisdiction to enjoin the state proceedings here. The jurisdictional limitation of the Anti-Injunction Act, 28 U.S.C. § 2283, is inapplicable to cases brought pursuant to 42 U.S.C. § 1983. In extending the contours of the Younger abstention doctrine, based on notions of comity and federalism, it must be recognized that it is an "extraordinary and narrow exception" to a district court's duty to decide cases within its jurisdiction.
 
 
 41
 Moreover, the limitation on the scope of the Younger doctrine adopted here is consistent with the view of federalism upon which it was founded. That limitation is necessary to preserve the role of the federal courts in exercising Congress's mandate to provide a forum for the adjudication of civil rights cases brought pursuant to § 1983. "Our Federalism," in the words of Justice Black, is "a system in which there is sensitivity to the legitimate interests of both State and National Governments." Younger v. Harris, supra, 401 U.S. at 44, 91 S.Ct. at 750. The extension of Younger principles to all civil litigation, coupled with the definition of "pending state litigation" adopted by the Supreme Court in Hicks v. Miranda, 422 U.S. 332, 349-50, 95 S.Ct. 2881, 45 L.Ed.2d 223 (1975), would effectively impose upon the § 1983 plaintiff a requirement of exhaustion of state judicial remedies, except in cases presenting extraordinary circumstances. Such an extension would undermine the holding of Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that judicial exhaustion is not required under § 1983, and thus would be inconsistent with recent Supreme Court teaching on the place of the Younger doctrine within the jurisprudence of the Civil Rights Act. See Huffman v. Pursue, Ltd., supra, 430 U.S. at 609 n.21, 95 S.Ct. 1200.
 
 
 42
 The district court cited four lower court opinions as support for its extension of the Younger doctrine to federal court interference with state court litigation between private parties: Lamb Enterprises, Inc. v. Kiroff, 549 F.2d 1052 (6th Cir.), Cert. denied, 431 U.S. 968, 97 S.Ct. 2927, 53 L.Ed.2d 1064 (1977); Louisville Area Inter-Faith Committee v. Nottingham Liquors, Ltd., 542 F.2d 652 (6th Cir. 1976); Gras v. Stevens, 415 F.Supp. 1148 (S.D.N.Y.1976); Kahn v. Shainswit, 414 F.Supp. 1064 (S.D.N.Y.1976). Although it seems clear that the Sixth Circuit has adopted a viewpoint on this issue contrary to our own, it should be pointed out that that viewpoint is not unanimously held within the Sixth Circuit. See Nottingham Liquors, supra at 655 (Edwards, J., concurring in part and dissenting in part).
 
 
 43
 The cited decisions from the Southern District of New York may have been significantly undermined by the later panel decision of the Second Circuit in Marshall v. Chase Manhattan Bank (National Association), 558 F.2d 680 (2d Cir. 1977). In Marshall the court reversed a district court's dismissal of an action by the United States Secretary of Labor against the trustee of the assets of an employee pension benefit plan. The trustee had earlier commenced an action in the New York state courts to secure judicial consent to the winding-up of the plan; the Secretary sought to enjoin the trustee from pursuing that state court action. Id. 681. Among the factors emphasized by the Court of Appeals in deciding that the Younger doctrine did not support the dismissal of the Secretary's complaint were that "(n)either the Secretary nor the State of New York has ever been a party to the state action," and that "(t)he pending state action is between private parties . . . ." Id. 684.
 
 
 44
 In two recent opinions the Fifth Circuit has expressed the view adopted herein that, generally, Younger principles apply only when the state is a party to the pending state litigation sought to be enjoined. See Ealy v. Littlejohn, 569 F.2d 219, 233 (5th Cir. 1978) (limiting the scope of Younger to, inter alia, "ongoing state-initiated civil proceedings" and "privately instituted civil contempt proceedings . . . in which the state's contempt process is involved"); Morial v. Judiciary Commission of State of Louisiana, 565 F.2d 295, 299 (5th Cir. 1977), Cert. denied, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978) (limiting the scope of Younger to cases in which there are pending "state enforcement proceedings").
 
 
 45
 The forgoing view was also expressed in a recent opinion written by Chief Judge Lord of the Eastern District of Pennsylvania. In Santiago v. City of Philadelphia, 435 F.Supp. 136 (E.D.Pa.1977), Judge Lord construed the Supreme Court opinions outlined above as "mandat(ing) Younger equitable restraint only in cases where the federal plaintiffs have attempted to invalidate a state statute and thereby enjoin a pending state civil proceeding which was initiated by the state against these individuals and was intended to enforce or vindicate an important state policy." 435 F.Supp. at 145 (citation omitted). Because there was "no pending state proceeding initiated by the state which could be disrupted by federal adjudication" in Santiago, Judge Lord concluded that the Younger doctrine did not apply. Id.; See D'Iorio v. County of Delaware, 447 F.Supp. 229, 240 (E.D.Pa.1978) (Lord, C. J.).
 
 
 46
 Given the division of authority among the Courts of Appeals, and within the Eastern District of Pennsylvania, with respect to the issue before us, we have carefully canvassed the policy implications of our decision that the district court erred in extending the Younger doctrine to this case. The district court believed that although the state court plaintiffs in this case are private tax sale purchasers that fact does not "evince a lessened state interest in the state court proceedings . . . ." Johnson v. Kelly, supra at 165. Rather, the court held that the Commonwealth of Pennsylvania has a very substantial interest in the outcome of the pending state court quiet title actions because its "ability to collect taxes through the tax sale procedure is dependent upon the willingness of people to buy properties at tax sales which in turn depends upon their ability to obtain valid title to all that the taxpayer owned . . . ." Id.
 
 
 47
 The relief which the federal plaintiffs seek here, however, is not likely to diminish Delaware County's ability to collect local taxes. They have requested that if the court finds that the County Return Act's provisions regarding tax sales are constitutionally inadequate then these plaintiffs and the class they seek to represent should be permitted to redeem title to their properties only upon payment to the County Treasurer of the full amount of taxes, penalties, interests and costs for which the properties were sold. In effect, they merely are seeking an extension of the two-year redemption period, which is already a part of the statutory scheme, for those individuals whose property has been sold at tax sales that they allege were constitutionally deficient. Whatever effect such an extension would have on the willingness of purchasers to buy at future tax sales held under the County Return Act is speculative indeed, given the fact that those purchasers are already faced with the possibility of the former owners' exercise of their statutory right of redemption, and given that Delaware County is no longer conducting tax sales pursuant to the challenged statute. See 72 P.S. § 5971 O ; footnote 2 Supra.
 
 
 48
 It is our belief that the district court's assertion that the state's tax collection process would be significantly and adversely affected by an injunction against the pending quiet title actions is not supported by the record in this case. Rather, it appears that the state's interest in the outcome of that private litigation is not appreciably greater than its interest in any private lawsuit in which state legislation may be subjected to a challenge on federal constitutional grounds. A holding that the latter state interest is sufficient to require a district court to dismiss a federal complaint on Younger grounds is fundamentally inconsistent with Congress's decision to create in 42 U.S.C. § 1983 a federal forum for the adjudication of constitutional claims such as this one, and with the Supreme Court's admonition that "(t)he doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Colorado River Water Conservation District, supra, 424 U.S. at 813, 96 S.Ct. at 1244. That fundamental inconsistency is even more telling when one considers that the combined effect of an extension of Younger principles to all pending civil litigation in the state courts with the Supreme Court's definition of a proceeding that is "pending" for Younger purposes in Hicks v. Miranda, would be the creation of a requirement of judicial exhaustion in cases brought pursuant to § 1983.
 
 III. CONCLUSION
 
 49
 Our reading of the Supreme Court's opinion in Trainor v. Hernandez, and an evaluation of the competing federalism concerns presented here, convince us that the district court erred in extending the scope of the Younger doctrine to a case such as this, in which federal plaintiffs seek to enjoin private parties from pursuing ongoing civil proceedings in the state courts. We are not called upon to consider the applicability of any other doctrine of equitable restraint to this case.
 
 
 50
 The order of the district court dismissing the complaint will be vacated.
 
 
 51
 ALDISERT, Circuit Judge, dissenting.
 
 
 52
 This appeal provides us a splendid vehicle to resolve an issue that so far has evaded resolution by the Supreme Court to what extent do the principles of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), apply to civil cases? As it often does, the Court has allowed this question to percolate in lower federal courts so that further analysis may contour an acceptable legal precept for civil cases as it finally did for criminal cases in 1971.[1] We now have the opportunity to construct a conceptual framework with consistency and symmetry, comprehensive enough to accommodate both civil and criminal cases.
 
 
 53
 Notwithstanding subsequent decisions that seem to embellish the basic structure of Younger, it is settled that federal courts must withhold their power to enjoin state criminal proceedings, except under extraordinary circumstances where the danger of irreparable loss is both great and immediate that a threat exists to plaintiff's federally protected rights which cannot be eliminated by his defense in a single state prosecution. If this be the test in a criminal case, it seems to me that it should form the basis of the test in civil cases as well. I am persuaded that this court should adopt a test so conceptualized, and no considerations have been advanced in Supreme Court decisions or elsewhere which persuade me otherwise. Thus I would hold that when the federal protections asserted by a federal plaintiff can be interposed by him as an effective defense in a state civil proceeding, a federal court should withhold its power to enjoin the state proceeding.
 
 I.
 
 54
 Any discussion of the court's power to enjoin state trials should begin with the Anti-Injunction Act, 28 U.S.C. § 2283:
 
 
 55
 A Court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
 
 
 56
 If there is to be legislatively created power and I use the term advisedly to distinguish it from judicially created power to enjoin the state proceeding here, it has to be based on the notion that 42 U.S.C. § 1983[2] comes within the "expressly authorized by Act of Congress" section of the Anti-Injunction Act. Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).
 
 
 57
 Prior to Mitchum the Supreme Court had sanctioned the use of federal injunctions against certain state criminal proceedings. "(A) Judicial exception to the longstanding policy evidenced by the statute has been made," Justice Black explained in Younger, "where a person about to be prosecuted in a state court can show that he will, if the proceeding in the state court is not enjoined, suffer irreparable damages. See Ex parte Young, 209 U.S. 123 (, 28 S.Ct. 441, 52 L.Ed. 714) (1908)." 401 U.S. at 43, 91 S.Ct. at 750 (my emphasis). This judicially created exception to the rather clear and seemingly unambiguous language of the Anti-Injunction Act reached its zenith in the mid-sixties in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), before being restricted in 1971 by Younger and its companion cases.
 
 
 58
 But the source for first creating and then restricting the exception to the Congressional mandate of § 2283 was judicial power, raw judicial power, in the true Bishop Hoadly sense.[3] Although Younger acknowledged the existence of the judicial exception, it did not meet the question whether § 1983 was to be construed as a statutory exception to the Act. But one year later Mitchum, answering the question affirmatively, reasoned as follows: Younger expressly reserved the question whether § 1983 comes within the "expressly authorized" exception of the Anti-Injunction Act; Younger based its abstention in terms of "the 'policy' ground of 'Our Federalism' ", 407 U.S. at 230, 92 S.Ct. at 2156; if § 1983 is not within the exception, then "we must overrule Younger and its companion cases insofar as they recognized the permissibility of injunctive relief against pending criminal prosecutions in certain limited and exceptional circumstances. For, under the doctrine of Atlantic Coast Line (R.R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970)), the anti-injunction statute would, in a § 1983 case, then be an 'absolute prohibition' against federal equity intervention in a pending state criminal Or civil proceeding under any circumstances whatever." 407 U.S. at 231, 92 S.Ct. at 2156.
 
 
 59
 This reasoning demonstrates a decisional technique probably legitimate, but only when utilized by the highest court of a jurisdiction whereby the Court exercised its judicial power, but at the same time publicly stated that it did not decide the authoritative basis for that power. See, E. g., Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).[4] Certainly a jurisprudential hiatus is created when a court resorts to this technique of decision making. After first exercising the power and before giving a rational explanation for it, the only authority for the interim decisions is judicial fiat[5] and not traditional decision making accompanied by a stated Ratio decidendi. But once principled reasons for the decision are stated, those reasons become the standards by which we must interpret that decision in future cases.
 
 
 60
 Thus, in considering the application of Younger v. Harris to civil cases, we must interpret the power of the federal courts to issue an injunction only in the context of how that power is derived from § 1983 as an "expressly authorized" exception to the anti-injunction statute. And here, in my judgment, Mitchum v. Foster is every bit as important as Younger v. Harris, because it is Mitchum that now serves as the fountainhead of federal court subject matter jurisdiction in state court injunction cases.
 
 
 61
 In construing the Anti-Injunction Act, the Mitchum court was careful to qualify the application of § 1983 when utilized as an "expressed authorized" exception of the Anti-Injunction Act. In emphasizing that there are limitations to the exception, the Court traced the history of the judicially created exception, stating "that federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights. Ex parte Young, 209 U.S. 123 (28 S.Ct. 441, 52 L.Ed. 714); cf. Truax v. Raich, 239 U.S. 33 (36 S.Ct. 7, 60 L.Ed. 131); Dombrowski v. Pfister, 380 U.S. 479 (85 S.Ct. 1116, 14 L.Ed.2d 22)." 407 U.S. at 242, 92 S.Ct. at 2162. Although holding that § 1983 is a statutory exception, the Court announced a discrete qualification:
 
 
 62
 In so concluding, we do not question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding. These principles, in the context of state criminal prosecutions, were canvassed at length last Term in Younger v. Harris, 401 U.S. 37 (91 S.Ct. 746, 27 L.Ed.2d 669), and its companion cases. They are principles that have been emphasized by this Court many times in the past.
 
 
 63
 407 U.S. at 243, 92 S.Ct. at 2162 (citations omitted).
 
 
 64
 Thus, in finally deciding that there is statutory authority for federal injunctions of state court proceedings, the Supreme Court emphasized that the principles of equity, comity and federalism that must restrain a federal court were not questioned or qualified; and in justifying the conclusion that § 1983 was an "expressly authorized" exception the Court did not distinguish between civil and criminal cases. "In short, if a § 1983 action is not an 'expressly authorized' statutory exception, the anti-injunction law absolutely prohibits in such an action all federal equitable intervention in a pending state court proceeding, whether civil or criminal, and regardless of how extraordinary the particular circumstances may be." Id. at 229, 92 S.Ct. at 2155. Indeed, although emphasizing Younger, a criminal case, the Court did not dilute the importance of the civil case, Atlantic Coast Line, supra : "Atlantic Coast Line and Younger . . . serve to delineate both the importance and the finality of the question now before us. And it is in the shadow of those cases that the question must be decided." Mitchum v. Foster, supra, 407 U.S. at 231, 92 S.Ct. at 2156.
 
 
 65
 We remain in that shadow. Unless I have overlooked basic conceptual underpinnings of the Supreme Court's teachings of Atlantic Coast Line, Younger, and Mitchum, the controlling legal precepts are placed in the following hierarchy of importance:
 
 
 66
 1. The Anti-Injunction Act expressing a Congressional policy of non-interference with both civil and criminal state proceedings.
 
 
 67
 2. The Younger v. Harris principles reiterating that federal non-interference is the rule and that an injunction will be permitted only
 
 
 68
 (a) upon proof of bad faith prosecution, or
 
 
 69
 (b) under extraordinary circumstances when the danger of irreparable loss is both great and immediate, and
 
 
 70
 (c) when plaintiff requires equitable relief because there is no adequate remedy at law, to-wit, plaintiff is unable to vindicate his federally protected rights as a defense in a single state court proceeding.
 
 
 71
 3. The Mitchum declaration that § 1983 is an "expressly authorized" exception to the Anti-Injunction Act, subject to the caveat that "we do not question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." 407 U.S. at 243, 92 S.Ct. at 2162.
 
 
 72
 Significantly, in fashioning these precepts, certain important considerations stand out. First, Younger, a criminal case, repeatedly emphasized that to withhold federal intervention was the rule and not the exception. Second, Mitchum, the decision that finally legitimated subject matter jurisdiction for limited federal intervention via § 1983, involved state Civil, and not criminal, proceedings.
 
 II.
 
 73
 Recent Supreme Court decisions, specifically Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); and Trainor v. Hernandez, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), are as important for what they did not decide, as for what they did decide. In each, the Court was unwilling to mandate the application of Younger abstention principles in all civil cases.[6] The present appeal provides an appropriate opportunity for this court to hold that Younger does so apply. None of the Court's decisions stands as a bar to the test I propose.
 
 A.
 
 74
 When the Supreme Court refused to limit the Younger principles to criminal cases only, it emphasized that when confronted with requests for federal judicial interference with state court functions, federal courts "should abide by standards of restraint that go well beyond those of private equity jurisprudence" because "interference with a state judicial proceeding prevents the state not only from effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies. Such interference also results in duplicative legal proceedings, and can readily be interpreted 'as reflecting negatively upon the state court's ability to enforce constitutional principles.' Cf. Steffel v. Thompson (, 415 U.S. 452) at 462 (94 S.Ct. 1209, 39 L.Ed.2d 505)." Huffman v. Pursue, Ltd., supra, 420 U.S. at 603-604, 95 S.Ct. at 1208. I am in full agreement with this cogent statement of the reasons for comity. To say that comity requires abstention in civil cases only when the state is a litigant or has a peculiar interest in the litigation is to put an unnecessary and grudging interpretation on basic concepts of federalism.
 
 
 75
 Moreover, I cannot reconcile such a niggardly interpretation with the lofty statement of reasons set forth in Juidice v. Vail :
 
 
 76
 We now hold, however, that the principles of Younger and Huffman are not confined solely to the types of state actions which were sought to be enjoined in those cases. As we emphasized in Huffman, the " 'more vital consideration' " behind the Younger doctrine of nonintervention lay not in the fact that the state criminal process was involved but rather in
 
 
 77
 " 'the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.' " Huffman, 420 U.S. at 601 (95 S.Ct., at 1206), quoting Younger, 401 U.S., at 44 (91 S.Ct., at 750).
 
 
 78
 This is by no means a novel doctrine. In Ex parte Young, 209 U.S. 123 (28 S.Ct. 441, 52 L.Ed. 714) (1908), the watershed case which sanctioned the use of the Fourteenth Amendment to the United States Constitution as a sword as well as a shield against unconstitutional conduct of state officers, the Court said:
 
 
 79
 "But the Federal court cannot, of course, interfere in a case where the proceedings were already pending in a state court. Taylor v. Taintor, 16 Wall. 366, 370 (21 L.Ed. 287); Harkrader v. Wadley, 172 U.S. 148 (19 S.Ct. 119, 43 L.Ed. 339)." Id., at 162 (28 S.Ct., at 455).[11]
 
 
 80
 11. Neither Ex parte Young, nor the cases cited by it, expressly premised this conclusion on § 5 of the Judiciary Act of 1793, 1 Stat. 335, or its successor sections (now 28 U.S.C. § 2283). These cases, rather, are "an application of the reason underlying the Act," Toucey v. New York Life Ins. Co., 314 U.S. 118, 135 (62 S.Ct. 139, 145, 86 L.Ed. 100) (1941), and reflect the applicability, wholly independent of a statutory codification, of the longstanding policies which inhere in the notions of comity and federalism, see Younger, 401 U.S., at 43-45 (91 S.Ct., at 750-751), 1 J. Kent, Commentaries on American Law * 411-412.
 
 
 81
 430 U.S. at 334-35, 97 S.Ct. at 1216-17.
 
 B.
 
 82
 Although Mr. Justice Blackmun seems to insist upon a showing of a pronounced state interest in the civil proceedings "before the federal court must refrain from exercising otherwise proper federal jurisdiction," Trainor v. Hernandez, supra, 431 U.S. at 448, 97 S.Ct. at 1921 (Blackmun J., concurring), his reference to "otherwise proper federal jurisdiction," does not discuss the limitations on federal intervention set forth in Mitchum, nor is his reasoning, in my view, responsive to the observations of Mr. Justice Stevens:
 
 
 83
 The Court explicitly does not decide "whether Younger principles apply to all civil litigation." Ante, at 445 n.8 (97 S.Ct., at 1918 n.8). Its holding in this case therefore rests squarely on the fact that the State, rather than some other litigant, is the creditor that invoked the Illinois attachment procedure. This rationale cannot be tenable unless principles of federalism require greater deference to the State's interest in collecting its own claims than to its interest in providing a forum for other creditors in the community. It would seem rather obvious to me that the amount of money involved in any particular dispute is a matter of far less concern to the sovereign than the integrity of its own procedures. Consequently, the fact that a State is a party to a pending proceeding should make it Less objectionable to have the constitutional issue adjudicated in a federal forum than if only private litigants were involved. I therefore find it hard to accept the Court's contrary evaluation as a principled application of the majestic language in Mr. Justice Black's Younger opinion.
 
 
 84
 431 U.S. at 464, 97 S.Ct. at 1928 (Stevens, J., dissenting).
 
 
 85
 Indeed, the test I propose is probably attuned to the specific emphases in Trainor made by Mr. Justice Stevens.[7] In my view, the centerpiece of a test for the application of Younger to civil cases is the availability of state court procedures that will permit the assertion of the federal plaintiff's constitutional arguments as a defense in the state proceeding. Mr. Justice Stevens dissented in Trainor because the Illinois "procedure (did) not afford a plain, speedy, and efficient remedy for (the plaintiff's) federal claim." 431 U.S. at 470, 97 S.Ct. at 1931. I would endorse the formulation presented by Mr. Justice Stevens for the reasons he set forth:
 
 
 86
 There should be no abstention unless the state procedure affords a plain, speedy, and efficient remedy for the federal wrong; indeed, the opinion in Younger in basing its decision on basic equity principles acknowledges this as the fundamental requirement in application of the abstention doctrine. The majority opinion in this case states the question presented as whether abstention is proper when a "State has already instituted proceedings . . . and the (appellees) could tender and have (their) federal claims decided in the state court." Ante, at 440 (97 S.Ct., at 1916). It then proceeds to quote from numerous cases requiring an adequate state remedy for application of the abstention doctrine. Younger v. Harris, 401 U.S. 37, 45 (91 S.Ct. 746, 751, 27 L.Ed.2d 669), quoting Fenner v. Boykin, 271 U.S. 240, 243-244 (46 S.Ct. 492, 493, 70 L.Ed. 927) (requiring the federal plaintiff to "first set up and rely on his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection"); Gibson v. Berryhill, 411 U.S. 564, 577 (93 S.Ct. 1689, 1697, 36 L.Ed.2d 488) (dismissal of the federal suit as "naturally presuppos(ing) the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved"); Kugler v. Helfant, 421 U.S. 117, 124 (95 S.Ct. 1524, 1530, 44 L.Ed.2d 15) (abstention founded "on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights"). Ante, at 441 (97 S.Ct., at 1916-1917). In my judgment, when a state procedure is challenged, an adequate forum must be one that is sufficiently independent of the alleged unconstitutional procedure to judge it impartially and to provide prompt relief if the procedure is found wanting.
 
 
 87
 431 U.S. at 469 n.15, 97 S.Ct. at 1931.
 
 
 88
 Even if the test be conceptualized as "a pronounced state interest," I would hold that a state has a pronounced interest in maintaining the viability and integrity of its own court system, which I consider to be a fundamental state institution.
 
 III.
 
 89
 To find that the state procedures do afford "a plain, speedy and efficient remedy for the federal wrong" requires a determination that the state's highest court is sensitive to rights assured by the Constitution, and that the federal plaintiff will therefore have an adequate remedy at law in the state proceeding. Although the willingness of state courts to vindicate these rights was, in the past, considered to be suspect,[8] that viewpoint has now been specifically rejected by a clear majority of the Supreme Court:
 
 
 90
 Despite differences in institutional environment and the unsympathetic attitude to federal constitutional claims of some state judges in years past, we are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States. . . . (T)here is "no intrinsic reason why the fact that a man is a federal judge should make him more competent, or conscientious, or learned with respect to the (consideration of constitutional claims) than his neighbor in the state courthouse." Bator, (Finality in Criminal Law and Federal Habeas Corpus For State Prisoners, 76 Harv.L.Rev. 441 (1963)) at 509.
 
 
 91
 Stone v. Powell, 428 U.S. at 493-94 n.35, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067.
 
 
 92
 Moreover, where, as here, the Pennsylvania court system is implicated, a distinguished colleague has observed that the Pennsylvania Supreme Court "is willing to extend the constitutional protection of the citizens of this state beyond the minimum federal standards . . . ."[9] Accordingly, I am not willing to conclude that the constitutional claim being asserted by appellants here cannot be hospitably received in the state forum.
 
 IV.
 
 93
 A final consideration remains: the effect of adopting an alternative formula. Any such alternative must recognize certain critical facts of judicial history. First, at no time during the development of the judicial exception to the Anti-Injunction Act prior to Mitchum did the Supreme Court permit a federal injunction of a state civil proceeding solely on the strength of § 1983 subject matter jurisdiction. Second, since Mitchum, the Supreme Court has never permitted such an injunction. Thus, notwithstanding the Court's reluctance to announce a rule for the universal application of Younger to all civil cases, the uncontroverted fact is that the Court continues to demonstrate the same reluctance to intrude in state civil cases as it has consistently demonstrated in criminal cases.
 
 
 94
 I therefore put aside as being contrary to All Supreme Court decisions that have permitted § 1983 intervention in state court proceedings civil or criminal any test that does not require a federal plaintiff to prove (1) exceptional circumstances where irreparable injury is both great and immediate, or (2) the absence of a plain, speedy, and efficient state remedy for the federal wrong, unless there is "proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction." Perez v. Ledesma, 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1971). Any test applied to a federal injunction against a state proceeding, civil Or criminal, which does not utilize these requirements flies in the face of the Anti-Injunction Act, the judicially created exceptions relating thereto expressed prior to Mitchum v. Foster,[10] the precise limitations imposed on the § 1983 exception stated by Mitchum, and Every Supreme Court case that has permitted intervention.[11] Because appellants here did not prove a case requiring federal intervention under these tests, I would affirm the judgment of the district court. Accordingly, I dissent.
 
 
 
 [1]
 Two of the actions are pending in the Delaware County Court of Common Pleas. The third, that brought by Curtis Building against the Tunstalls, has been twice decided in the Tunstalls' favor by the Court of Common Pleas, and twice reversed by the Commonwealth Court of Pennsylvania. See Curtis Building Co. v. Tunstall, --- Pa.Cmwlth. ---, 387 A.2d 1370 (1978). The Tunstalls' petition for allowance of appeal is presently pending in the Supreme Court of Pennsylvania
 
 
 [2]
 Delaware County conducted tax sales pursuant to the County Return Act until January 1, 1976. Effective on that date its statutory exemption from the provisions of the Real Estate Tax Sale Law, Act of July 7, 1947, P.L. 1368, No. 542, §§ 101-803, as amended, 72 P.S. §§ 5860.101-5860.803, was eliminated. See Act of July 3, 1974, P.L. 451, No. 157, § 1, 72 P.S. § 5860.102 (Purdon Supp. 1978)
 
 
 [3]
 See New Jersey Education Association v. Burke, 579 F.2d 764 (3d Cir. 1978), --- U.S. ----, 99 S.Ct. 252, 58 L.Ed.2d 239 (holding Younger inapplicable to a federal action in which the requested relief would interfere with a statutory appeal from the issuance of administrative regulations brought by private litigants against a state agency)
 
 
 [1]
 The Younger principles emanate from a series of cases treating federal intervention decided February 23, 1971, Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669; Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688; Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696; Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701; Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781; Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792
 
 
 [2]
 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [3]
 Nay, whoever hath an Absolute authority to Interpret any written or spoken laws, it is He who is truly the Law Giver to all intents and purposes, and not the Person who first wrote and spoke them
 J. Gray, The Nature and Sources of the Law 120 (1909).
 
 
 [4]
 In Monell, the issue was whether a school board was a "person" within the meaning of § 1983 or a "municipality" immune from liability under the teaching of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In Monroe, it was decided that "Congress did not undertake to bring municipal corporations within the ambit of (§ 1983)." 365 U.S. at 187, 81 S.Ct. at 484. However, in Monell, the Court admitted:
 Although, after plenary consideration, we have decided the merits of over a score of cases brought under § 1983 in which the principal defendant was a school board and, indeed, in some of which § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343, provided the only basis for jurisdiction we indicated in Mt. Healthy City Board of Ed. v. Doyle, 429 U.S. 274, 279 (97 S.Ct. 568, 50 L.Ed.2d 471) (1977), last Term that the question presented here was open and would be decided "another day." That other day has come and we now overrule Monroe v. Pape, supra, insofar as it holds that local governments are wholly immune from suit under § 1983.
 436 U.S. 663, 98 S.Ct. at 2021 (footnote omitted citing 23 cases in which the Court had reached the merits without deciding whether the defendant could be held liable as a matter of law).
 
 
 [5]
 A noteworthy example of decision by judicial fiat is the action of our court in Cooper v. Hutchinson, 184 F.2d 119, 124 (3d Cir. 1950), when, in one sentence, we stated that § 1983 was a statutory exception to the Anti-Injunction Act: "And the provision in the Judicial Code forbidding the use of the injunction against state court action has a stated exception when a federal statute allows it, as it does here."
 
 
 [6]
 See Huffman v. Pursue, Ltd., 420 U.S. at 607, 95 S.Ct. at 1209; Juidice v. Vail, 430 U.S. at 336 n.13, 97 S.Ct. at 1218; Trainor v. Hernandez, 431 U.S. at 445 n.8, 97 S.Ct. at 1918
 
 
 [7]
 I believe that with Mr. Justice Stevens, a majority of the Supreme Court would accept this test. To examine carefully the alignments in Huffman, Juidice, and Trainor, it is important to distinguish disagreement over the choice of the controlling legal precepts and the application of the precepts to the facts
 
 
 [8]
 State judges popularly elected may have difficulty resisting popular pressures not experienced by federal judges given lifetime tenure designed to immunize them from such influences
 Stone v. Powell, 428 U.S. 465, 525, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (Brennan, J., dissenting).
 
 
 [9]
 D. Zeigler, Constitutional Rights of the Accused Developing Dichotomy Between Federal and State Law, 48 Pa.B.A.Q. 241, 249 (1977):
 The message is clear for all to observe. The Pennsylvania Supreme Court is willing to depart from the views of a majority of the United States Supreme Court in many areas of criminal law. It is willing to extend the constitutional protections of the citizens of this state beyond the minimum federal standards which, as we have observed, are contracting.
 
 
 [10]
 Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Cf. Traux v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492; 70 L.Ed. 927 (1926); Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935); Beal v. Missouri Pac. R. Co., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941); Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941); Williams v. Miller, 317 U.S. 599, 63 S.Ct. 258, 87 L.Ed. 489 (1942); Douglas v. City of Jeanette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968)
 
 
 [11]
 See, e. g., Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)