584 F.Supp. 711 (1984)
Louis SCHWARTZ, Individually, and for Persons similarly situated, Plaintiffs,
v.
JUDICIAL RETIREMENT SYSTEM OF NEW JERSEY; Division of Pensions of the Department of the Treasury; State House Commission; Supreme Court of the State of New Jersey; individually, Honorable Chief Justice Robert N. Wilentz; Honorable Justice Robert L. Clifford; Honorable Justice Sidney M. Schreiber, Honorable Justice Stewart G. Pollock; Honorable Justice Daniel J. O'Hern; Honorable Justice Marie L. Garibaldi, Defendants.
Civ. No. 83-3735.
United States District Court, D. New Jersey.
April 12, 1984.
*712 *713 *714 Louis Schwartz, Fiorello, Moraff & Foster, P.A., Totowa, N.J., for plaintiffs.
Irwin I. Kimmelman, Atty. Gen. of N.J., Michael R. Clancy, Andrea M. Silkowitz, Deputy Attys. Gen., Trenton, N.J., for defendants.

OPINION
LACEY, District Judge.

INTRODUCTION
In this action plaintiff contests the constitutional validity of N.J.S.A. 43:6A-13(a) (West Supp.1983-84) and an administrative directive of the New Jersey Supreme Court. Both rules forbid retired state judges receiving pensions from engaging in certain forms of private law practice. Plaintiff claims that the rules are arbitrary and irrational, and hence in violation of the equal protection clause of the fourteenth amendment. The matter is before the court on cross motions for summary judgment under Fed.R.Civ.P. 56(c).
The underlying facts are uncontested. Plaintiff Louis Schwartz served as a judge of the New Jersey Superior Court from April 9, 1970 to July 21, 1982. He then retired and began collecting a lifetime pension of $52,500 per year under the state Judicial Retirement System, N.J.S.A. 43:6A-1 et seq. (West Supp.1983-84). The statute provides that no person receiving a pension under the Judicial Retirement System may "engage in the practice of law before any of the courts of this State." N.J.S.A. 43:6A-13(a). On December 4, 1975 the state Supreme Court issued administrative guidelines delineating the scope of the ban:
(2) A retired judge may not serve as an attorney in any matter in any court of the State of New Jersey. This prohibition includes participating in the actual conduct of any proceeding before the court, appearing at counsel table during the course of a court proceeding, and serving therein either as associate counsel or counsel of record....
(4) A retired judge may not serve as an attorney in any contested or uncontested matters before either State or local administrative agencies, boards and tribunals exercising a discretionary or quasi-judicial function....
Memorandum to Justices and Judges (Dec. 4, 1975) (promulgating regulations). The directive also banned pension recipients from serving as expert witnesses or accepting miscellaneous court appointments. It explicitly permitted them to perform tasks connected with litigation but not requiring court appearances. The directive also exempted federal court practice from its prohibition.
On April 13, 1982 plaintiff sent the first of a series of letters to the state Supreme Court by way of the Administrative Director. In it, he explained that he wished to take a position as county counsel, and inquired whether the ethical guidelines would prohibit such employment. In this and subsequent letters, he explained that the position would involve advising a public agency. He would be present at quasi-judicial hearings held by the agency, but not as a litigant or interested party. The Administrative Director of the Courts replied by letter dated July 14, 1982 that the "role of a retired judge associated with a public agency would have to be of the same character as that of one acting `of counsel' to a law firm."
Plaintiff continued to seek clarification. By November 3, he received a preliminary opinion from the Supreme Court that the employment was impermissible. The Administrative Director asked for further information about plaintiff's duties. The Supreme Court considered the information, and confirmed the earlier opinion. On December 13, 1982 it advised plaintiff that employment as county counsel "would contravene the letter and spirit of the guidelines ...." An explanation for the ruling appeared in the November 3, 1982 letter:
The holding of such a position may result in the perception of your use of your *715 former office, in large part through identification with litigation. Further, it would be inappropriate for you to appear at a public meeting as advisor to a board or agency. Such appearance would result in the public airing of your legal opinions and might lend added influence to any decision made by the board or agency.
Plaintiff brought this action on October 5, 1983. His main argument is that the proffered justification should apply equally to pensioned and unpensioned judges, and that the distinction is therefore irrational. He also argues that nothing in the statute justifies the Supreme Court's rules against employment in a nonadvocatory capacity. Finally, plaintiff argues that the legislature, in promulgating the original statute, invaded a province committed to the Supreme Court by the state constitution.

I. JURISDICTION
Plaintiff sues under 42 U.S.C. § 1983 for violations of his fourteenth amendment rights by the State of New Jersey. This court has jurisdiction over such claims by virtue of 28 U.S.C. § 1343(3) and (4). He principally claims that defendants are denying him equal protection of the laws. The complaint states a constitutional claim that is not "insubstantial" or "frivolous." Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). It is well within the traditional meaning of civil rights or equal rights, as specified in the jurisdictional statute; it is not simply a federal statutory claim appended to § 1983 for jurisdictional purposes. See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).
The question remains whether this is an impermissible attempt to "appeal" a decision of the New Jersey Supreme Court to this court. Federal district courts have no authority to hear appeals from state court decisions. District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 1311, 75 L.Ed.2d 206 (1983); Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 296, 90 S.Ct. 1739, 1748, 26 L.Ed.2d 234 (1970). That power is reserved to the Supreme Court by virtue of 28 U.S.C. § 1257. Where, as here, state courts have been granted rulemaking power, the line is sometimes thinly drawn between appeals of a state judicial decision and civil suits challenging court-made rules on federal grounds. The latter may be heard in federal district court; the former may not.
The Supreme Court, in District of Columbia, supra, recently explored the distinction between judicial and administrative acts by state courts. It held that the appellate court's refusal to waive its own rule requiring attendance at an ABA-accredited law school as a prerequisite to admission to the bar was a judicial act. The Court emphasized that appellant had received Feldman's application, applied the local law to the facts of the case, and adjudicated his rights. The court in such a case
investigates, declares and enforces liabilities as they stand upon present or past facts and under laws supposed already to exist.... Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.
Id., 103 S.Ct. at 1312 (quoting Prentis v. Atlantic Coast Line, 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)). The Supreme Court held that the applicants could challenge the appellate court's refusal to waive its rules only by way of appeal. Plaintiffs' constitutional challenges to the rules themselves, however, were properly before the district court.
Looking not to the form, but to the "character of the proceedings," id., 211 U.S. at 226, 29 S.Ct. at 69, I have little doubt that plaintiff here challenges the rules themselves. Promulgated by administrative directive on December 4, 1975, they clearly have prospective general application. Plaintiff's chief line of attack depends on the fact that the rules govern only pensioned judges. Thus plaintiff's *716 grounds for objection are inherent in the regulations, and do not turn on any particular application of them.
The Supreme Court has often recognized that a state court may "act in a non-judicial capacity in promulgating rules regulating the bar." District of Columbia, supra, 103 S.Ct. at 1316. See Supreme Court of Virginia v. Consumers Union, 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980); Lathrop v. Donohue, 367 U.S. 820, 827, 81 S.Ct. 1826, 1829, 6 L.Ed.2d 1191 (1961) (plurality opinion). When it does, its rules may be challenged by way of a suit in federal district court; for purposes of 28 U.S.C. § 1257, nonadjudicative rules stand on the same basis as state statutes or administrative regulations.
I find that this court has jurisdiction over plaintiff's claim. I would not have jurisdiction over a claim that the state Supreme Court erroneously applied its rules to the facts of plaintiff's case, but plaintiff makes no such claim.[1] This is a "civil action" under 28 U.S.C. § 1343; it is not an "appeal" under 28 U.S.C. § 1257.

II. ABSTENTION
Defendants argue that I should abstain from deciding this question. They state that the matter is best left to the state courts. Plaintiff in their view may bring a state court action and eventually carry the matter to the state Supreme Court, sitting in its adjudicative rather than its rulemaking capacity. Nevertheless, I find abstention unwarranted here.
Concededly, the regulation of the legal profession traditionally has lain with the state. The state has broad power to establish professional standards, particularly with regard to the legal profession. Goldfarb v. Virginia State Bar, 421 U.S. 773, 792, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975). "The State of New Jersey has an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses." Middlesex Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423, 434, 102 S.Ct. 2515, 2522, 73 L.Ed.2d 116 (1982) (applying Younger abstention to pending state disciplinary proceedings). Judges, even more than lawyers, are "essential to the primary governmental function of administering justice ...." Goldfarb, supra, 421 U.S. at 792, 95 S.Ct. at 2016. If anything, New Jersey's interest in regulating the ethical conduct of its judges is even greater than its interest in prescribing standards for attorneys. Coruzzi v. State of New Jersey, 705 F.2d 688, 691 (3d Cir.1983) (applying Younger abstention to removal proceedings against state judge). It may even be that the relationships involved are "extremely delicate," as argued by defendant. More must be shown to invoke the "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (quoting County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188, 79 S.Ct. 1060, 1062, 3 L.Ed.2d 1163 (1959)). Accord, Johnson v. Kelly, 583 F.2d 1242, 1250 (3d Cir.1978).
The Supreme Court has confined abstention to three general categories. Colorado River, supra, 424 U.S. at 814, 96 S.Ct. at 1244. First, a district court will abstain where a state court decision of a novel state law issue might moot or alter *717 the federal constitutional issue before the federal court [hereinafter "Pullman abstention"]. E.g., Lake Carriers v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); United Gas Pipeline Co. v. Ideal Cement Co., 369 U.S. 134, 82 S.Ct. 676, 7 L.Ed.2d 623 (1962); Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).[2] Second, the federal court will abstain where a case presents difficult state law issues bearing on substantial public policies transcending in importance the case at bar [hereinafter "Burford abstention"]. Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Third, this court must abstain where plaintiff seeks to restrain certain state judicial proceedings which are then pending [hereinafter "Younger abstention"]. E.g., Middlesex Ethics Committee, supra; Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). These categories are no more than a guide, of course. Abstention is a developing field of law, grounded in principles of federalism, and is not easily reduced to any formula. The proper relationship between state policy and the federal judiciary, and not any categorical scheme, must guide the discretion of the district court. See Williams v. Red Bank Bd. of Ed., 662 F.2d 1008, 1023 n. 15 (3d Cir.1981).
Younger abstention is clearly inappropriate. The first step in the Younger analysis is determining whether there is a pending, i.e., ongoing, state judicial proceeding. Middlesex Co., supra, 457 U.S. at 432, 102 S.Ct. at 2521; Steffel v. Thompson, 415 U.S. 452, 460-75, 94 S.Ct. 1209, 1216-24, 39 L.Ed.2d 505 (1974); Coruzzi, supra, 705 F.2d at 690. There is no pending state proceeding with which a decision on the merits here would interfere. Younger abstention has never applied in such a case.[3] In Steffel, for example, plaintiffs sought a declaratory judgment that threatened prosecution would violate their first amendment rights. The Court held that attacks on the constitutionality of a statute, whether facial or as-applied, were cognizable where there was no prosecution actually in progress and plaintiffs sought a declaratory judgment. Here, too, plaintiff attacks a rule that will be applied if he accepts employment. Considerations of federalism and comity "have little force in the absence of a pending state proceeding." Steffel, supra, 415 U.S. at 462, 94 S.Ct. at 1217 (quoting Lake Carriers' Ass'n, supra, 406 U.S. at 509, 92 S.Ct. at 1756).
Nor do the issues warrant Pullman abstention. Defendants can point to no novel issue of state law that would moot plaintiff's constitutional claim or place it in a different light. The state Supreme Court has authoritatively advised plaintiff that its regulations apply to him, if it were not clear from the regulations themselves. The validity of the state pension law and the nature of plaintiff's status under it are not in doubt. Plaintiff's separation of powers arguments, while matters of state law, are insubstantial. See infra. The heart of defendant's abstention argument is that plaintiff could bring his claims in state court instead, because the state courts have historically been receptive to review of court rules. See American Trial Lawyers v. New Jersey Supreme Court, 66 N.J. 258, 267, 330 A.2d 350, 355 (1974) (review of court rules "never foreclosed"). See also In re Sackman, 90 N.J. 521, 448 *718 A.2d 1014 (1983) (reviewing rule requiring out-of-state attorneys to maintain principal office in New Jersey); In re Professional Ethics Advisory Committee Opinion No. 475, 89 N.J. 74, 444 A.2d 1092, appeal dismissed, 459 U.S. 962, 103 S.Ct. 285, 74 L.Ed.2d 272 (1982). This court, however, does not have discretion to dismiss a suit "merely because a State court could entertain it." Colorado River, supra, 424 U.S. at 813, 96 S.Ct. at 1244 (quoting Alabama Public Service Comm'n v. Southern R. Co., 341 U.S. 341, 361, 71 S.Ct. 762, 774, 95 L.Ed. 1002 (1951)).
The federal court will abstain where a disputed issue of state law is likely to alter the federal claim. The gist of plaintiff's claim, however, is that the distinction between pensioned and unpensioned judges is irrational. The existence of that distinction is undisputed. I cannot abstain where defendants would simply prefer to be in state court. Wisconsin v. Constantineau, 400 U.S. 433, 437-39, 91 S.Ct. 507, 510-11, 27 L.Ed.2d 515 (1971); Zwickler v. Koota, 389 U.S. 241, 251, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967). Plaintiff had a right to choose a federal forum for his constitutional claim. Id., 389 U.S. at 248, 88 S.Ct. at 395. I cannot require that he exhaust state law remedies before bringing this § 1983 action. Patsy v. Bd. of Regents, 457 U.S. 496, 500, 102 S.Ct. 2557, 2559-60, 73 L.Ed.2d 172 (1982); Steffel, supra, 415 U.S. at 472-73, 94 S.Ct. at 1222; Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961).
Finally, I find Burford abstention inapplicable here. Burford, supra, and its progeny mainly bespeak the federal courts' reluctance to meddle with highly complex, usually highly technical, state regulatory schemes. Burford itself, for example, would have required the federal court to interpret state regulations governing oil and gas conservation and the drilling of wells. I do not find that Burford or general policies underlying the Burford line of cases demand abstention.
First, this court does not stray beyond its area of expertise in hearing this case. Regulations pertaining to conflicts of interest are not overly technical or foreign to the concerns of federal courts.
More to the point, this case involves no issue of state law as such. The court would not be interpreting the state law in the sense of telling the state what its law is; rather, it would be measuring an unambiguous state law against the requirements of the federal constitution. Thus no "difficult question of state law," Colorado River, supra, 424 U.S. at 814, 96 S.Ct. at 1244, is involved as in Louisiana Power, supra. See also Baltimore Bank v. Farmers Cheese Cooperative, 583 F.2d 104, 110 (3d Cir.1978) (abstention inappropriate where underlying commodity subject to complex regulations, but actual claim was simple breach of contract). The typical Burford case is a diversity action in which the federal court would in some sense usurp a state law decision.[4] Here plaintiff asserts a pure federal constitutional claim. The existence of a strong federal claim may well raise the threshold of justification for abstention, Colorado River, supra, 424 U.S. at 815 n. 21, 96 S.Ct. at 1245 n. 21, particularly where no state law issues are posed.[5] Where plaintiff alleges *719 that a state rule on its face violates the federal constitution, the federal court's concern with the state's efforts to develope a coherent policy must be tempered. Cf. Hotel & Restaurant Employees v. Danziger, 709 F.2d 815, 832 (3d Cir.), prob. juris. noted, ___ U.S. ___, 104 S.Ct. 479, 78 L.Ed.2d 677 (1983) ("[N]o [Burford] argument can be entertained based on disruption of a state administrative scheme in a case in which the court is asked to decide whether the very existence of that scheme violates a paramount federal statute").
Nor is this a case in which a federal court decision would disrupt a state system of administrative review designed to ensure consistency within a complex regulatory system. See Colorado River, supra, 424 U.S. at 815, 96 S.Ct. at 1245; Alabama Public Service Comm'n v. Southern R. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). This lawsuit substitutes not for a state administrative review system, but for a hypothetical state lawsuit asserting the same constitutional claim. Cf. Heritage Farms v. Solebury Tp., 671 F.2d 743, 747-48 (3d Cir.), cert. denied, 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982) (allegation of unfair or corrupt administration of state regulations not subject to Burford abstention).
In summary, few factors operate in favor of abstention. To be sure, public rights and important state policies are involved. But "there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." Zablocki v. Redhail, 434 U.S. 374, 379 n. 5, 98 S.Ct. 673, 677 n. 5, 54 L.Ed.2d 618 (1978). Otherwise, a federal court could never strike down a state statute. This is a case in the Zablocki, not the Burford, mold. The Zablocki plaintiff, like plaintiff here, challenged the constitutionality of a state statute.[6] The statute regulated marriage, like judicial ethics a matter of traditional and exclusive state regulation. Justice Marshall found no pending state proceeding; no ambiguous issue of state law; and no complex issue of state law bearing on the coherence of state public policy. 434 U.S. at 379-80 n. 5, 98 S.Ct. at 677-78 n. 5. In such a situation, the supremacy of federal law and plaintiff's right to choose a federal forum outweigh all other considerations. A judgment for plaintiff would do no more than ensure that state authority is exercised within the broad boundaries of constitutionality. Cf. Colorado River, supra, 424 U.S. at 816, 96 S.Ct. at 1245 (federal court may hear mixed federal and state claims regarding water rights). The district courts may, and must, hear such claims.

III. THE MERITS

A. Preliminary State Law Issues

Plaintiff first argues that N.J.S.A. 43:6A-13(a), which forbids judges on pensions to "engage in the practice of law before any of the courts of this state," violates state principles of separation of powers. He states that regulation of judicial ethics is constitutionally committed to the New Jersey Supreme Court. N.J. Const. (1947), art. VI, § 2, ¶ 3; Knight v. Margate, 86 N.J. 374, 390-91, 431 A.2d 833, 842 (1981); In re Gaulkin, 69 N.J. 185, 188-89, 351 A.2d 740, 743-44 (1976). Thus, the argument runs, a statute regulating judicial ethics must be invalid.
*720 As a matter of state law, it is not true that statutes regulating judicial ethics are invalid. "[I]n the full enjoyment of its paramount and exclusive powers over the judicial branch, the Supreme Court has the authority, reasonably to be implied under the twin principles of the separation and interdependence of governmental powers, to permit or accommodate the lawful and reasonable exercise of the powers of other branches of government even as that might impinge upon the Court's constitutional concerns in the judicial area." Knight, supra, 86 N.J. at 391, 431 A.2d at 842 (upholding application of state Conflicts of Interest Law to judges). In any event, the point is inconsequential. With or without the statute, it is clear beyond cavil that the New Jersey Supreme Court had the inherent power to enact its administrative ethical guidelines; indeed, plaintiff's argument depends on the exclusiveness of that power. Moreover, the statute regulates only practice before the New Jersey courts. Plaintiff seeks only to serve as county counsel in administrative proceedings. Therefore, I would entertain serious doubts regarding his standing to challenge the statute. See generally L. Tribe, American Constitutional Law, §§ 3-173-30 (1978); C. Wright, The Law of Federal Courts, §§ 12-13 (4th ed. 1983). See also Clements v. Fashing, 457 U.S. 957, 966 n. 3, 102 S.Ct. 2836, 2845 n. 3, 73 L.Ed.2d 508 (1982).
For the purposes of this opinion, I will regard plaintiff's case as a challenge to the regulations of the New Jersey Supreme Court, promulgated under the Court's power to regulate "every area in which unjust or unethical conduct might afflict the public at the hands of those admitted by the Court to the practice of law." American Trial Lawyers Assoc. v. New Jersey Supreme Court, 66 N.J. 258, 264, 330 A.2d 350, 353 (1974). That rulemaking power, explicitly granted by art. VI, § 2, ¶ 3 of the 1947 Constitution, cannot seriously be challenged.[7] Moreover, it is clear that the Court's regulations apply to plaintiff. The letter from the Administrative Director authoritatively advised plaintiff to that effect, and it explicitly rested on the Court's guidelines, not on the statute. No authority has ever purported to apply the statute to plaintiff, and it does not appear that the statute would forbid employment as county counsel. Plaintiff's legitimate claims arise out of the application of the Court's ethical guidelines.

B. Plaintiff's Equal Protection Challenge

"Membership in the bar is a privilege burdened with conditions." Matter of Rouss, 221 N.Y. 81, 84, 116 N.E. 782, 783 (1917) (Cardozo, J.). Nowhere is that more true than in the case of judges. The state judiciary of New Jersey is hemmed in with regulations aimed at avoiding even the appearance of impropriety. See, e.g., N.J. Code of Judicial Conduct, Canon II; N.J. Ct.R. 1:15 (limiting activities of judges); N.J.Ct.R. 1:17 (prohibiting political activity); N.J.S.A. 52:13D-17.2 (prohibiting casino-related activities by judges and other officials within two years of leaving office). The state Supreme Court has recognized that "[i]ntegrity is the very breath of justice. Confidence in our law, our courts and in the administration of justice is our supreme interest. No practice must be permitted to prevail which invites toward the administration of justice a doubt or distrust of its integrity." Perillo v. Advisory Committee *721 on Prof. Ethics, 83 N.J. 366, 373, 416 A.2d 801, 805 (1980) (quoting Erwin M. Jennings Co. v. DiGenova, 107 Conn. 491, 499, 141 A. 866, 868 (Sup.Ct. Errors 1928)). The need to maintain public confidence in the administration of justice has traditionally justified ethical restrictions on judicial activities, including activities unobjectionable in themselves. See, e.g., Knight v. Margate, 86 N.J. 374, 393, 431 A.2d 833, 843 (1981) (barring judges from casino related activities); In re Vasser, 75 N.J. 357, 382 A.2d 1114 (1978) (misuse of judicial office in private practice); In re Gaulkin, 69 N.J. 185, 199, 351 A.2d 740, 747 (1976) ("certain amenities of life, and perhaps even some legal rights, have to be sacrificed" to avoid appearance of impropriety). Even for an ordinary attorney, any reasonable public perception of impropriety, however unfounded in an individual case, suffices to trigger ethical concerns. See Reardon v. Marlayne, 83 N.J. 460, 473, 416 A.2d 852, 859 (1980).
The need to avoid the appearance of wrongdoing follows a judge even into retirement. Like it or not, a retired judge is still perceived as a judge. Thus the rule at issue here extends its ban to judges receiving pensions. The Court, by way of the Administrative Director, advised plaintiff:
The Court has concluded, generally, that any public agency position you assume would be limited in scope to that of an advisor.... [I]t would not be appropriate for you to be the counsel to a public agency or entity. The holding of such a position may result in the perception of your use of your former office, in large part through identification with litigation. Further, it would be inappropriate for you to appear at a public meeting as advisor to a board or agency. Such appearance would result in the public airing of your legal opinions and might lend added influence to any decision made by the board or agency.
(Letter opinion dated November 3, 1982). Clearly the underlying concern is the use of judicial prestige to advance some unrelated cause. See Vasser, supra (use of judicial stationery in private practice). Thus, as noted above, the Court has adopted rules that effectively restrict retired judges to low profile office work that would not result in public identification with any cause or legal issue.[8]

*722 1. Level of Scrutiny

Plaintiff contends that the state ethical rule violates his fourteenth amendment right to equal protection of the laws. First, he claims that the rule as a whole bears no reasonable relation to judicial ethics. Second, he claims that the rule irrationally distinguishes between judges and other public employees. Third, and most significantly, he claims that application of the rule to judges on pensions, but not to unpensioned retired judges, creates a distinction without any ethical justification.
Plaintiff shoulders a heavy burden. He points to no factor that would invoke heightened scrutiny under the equal protection clause. A state enactment that does not implicate a suspect classification[9] or a fundamental right[10] merits only "rational relationship" scrutiny. San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 16-17, 40, 93 S.Ct. 1278, 1287-88, 1300, 36 L.Ed.2d 16 (1973). The court will strike it down only if the means chosen are "wholly irrelevant to the State's objective." McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Accord, McDonald v. Bd. of Election, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). That deference extends to legislative fact-finding; the courts will uphold an enactment if "any state of facts reasonably may be conceived to justify it." McGowan, supra, 366 U.S. at 426, 81 S.Ct. at 1105. While Supreme Court cases have on occasion required a rational relation to some articulated state purpose, they have more often declined to do so. Murillo v. Bambrick, 681 F.2d 898, 908 n. 20 (3d Cir.1982) (reviewing cases), cert. denied, 459 U.S. 1017, 103 S.Ct. 378, 74 L.Ed.2d 511 (1983). It is clear that the reviewing court may hypothesize reasonable legislative purposes. United States R. Retirement Bd. v. Fritz, 449 U.S. 166, 178, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); Owens v. Barnes, 711 F.2d 25, 27 (3d Cir.), cert. denied, ___ U.S. ___, 104 S.Ct. 400, 78 L.Ed.2d 341 (1983); Eatough v. Albano, 673 F.2d 671, 676 n. 4 (3d Cir.), cert. denied, 457 U.S. 1119, 102 S.Ct. 2931, 73 L.Ed.2d 1331 (1982).
Since the abandonment of the old substantive due process, states have had a free hand in regulating professions. Compare Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), with Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).[11] The right to pursue a skilled profession is protected only against arbitrary or wholly unreasonable interference by the state. See Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 488-90, 75 S.Ct. 461, 464-66, 99 L.Ed. 563 (1955) (regulation of opticians *723 upheld); Semler v. Oregon State Bd. of Dental Examiners, 294 U.S. 608, 611, 55 S.Ct. 570, 571, 79 L.Ed. 1086 (1935) (same, dentists); Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889) (same, physicians); Eatough, supra (regulation singling out osteopaths from other medical personnel upheld under rational basis test). Ethical regulations of the practice of law invoke only rational basis scrutiny, unless some other constitutional provision is implicated. Compare Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 459, 98 S.Ct. 1912, 1920, 56 L.Ed.2d 444 (1978) (anti-solicitation rule survives first amendment challenge), and United Mine Workers v. Dist. 12, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967) (rational basis review heightened where ethical regulation impinges on free expression), with Konigsberg v. State Bar, 366 U.S. 36, 44, 81 S.Ct. 997, 1003, 6 L.Ed.2d 105 (1961) (rule denying admittance to the bar to candidates who refused to answer questions about political activities upheld as not arbitrary or irrational), and Schware v. Bd. of Bar Examiners, 353 U.S. 232, 238-39, 77 S.Ct. 752, 755-56, 1 L.Ed.2d 796 (1957) ("good character" qualification for bar must have "rational connection with the applicant's fitness or capacity to practice law").
The pursuit of a profession may create an expectation triggering procedural due process protections. Bd. of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972).[12] It is not, however, an equal protection "fundamental right" demanding strict scrutiny. Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312-13, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). Nor does this rule, like the ban on lawyer solicitation and advertising in Ohralik, supra, and Bates v. State Bar, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), impinge on first amendment free speech concerns. It is not directed at speech at such, and even a regulation of solicitation of employment "is a subject only marginally affected with First Amendment concerns." Ohralik, supra, 436 U.S. at 459, 98 S.Ct. at 1920. Neither pensioned judges nor the state judiciary is a group "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." San Antonio Independent School Bd. v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). See United States v. Carolene Products Co., 304 U.S. 144, 152-53 n. 4, 58 S.Ct. 778, 783-84 n. 4, 82 L.Ed. 1234 (1938). Nor is advanced age a suspect classification. Murgia, supra, 427 U.S. at 313, 96 S.Ct. at 2566; Price v. Cohen, 715 F.2d 87, 92-93 (3d Cir.1983); Malmed v. Thornburgh, 621 F.2d 565, 570 (3d Cir.), cert. denied, 449 U.S. 955, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980). In any event, age discrimination is hardly an issue. Unretired, presumably younger, judges are forbidden to practice law in any manner. Moreover, the partial ban on practice by pensioned judges does not apply to retired judges who defer or otherwise do not receive pensions. There is no evidence of an age differential between pensioned and unpensioned retirees.
More generally, there is little reason to suspect any basis for discrimination. The regulation was adopted by and for judges; the Supreme Court explicitly applied the guidelines to "judges and justices," i.e. to itself. Thus the opportunity for a "we they" distinction is absent. See Carolene Products, supra; J. Ely, Democracy and Distrust 73-183 (1980). Cf. Murgia, supra, 427 U.S. at 313-14, 96 S.Ct. at 2566-67 (Older citizens not a discrete and insular minority, but rather "a stage that each of us will reach if we live out our normal span"). Accord, Price, supra.
Plaintiff thus concedes that the court is confined to "rational basis" review. The fourteenth amendment protects him *724 only against arbitrary and irrational limitations on his right to practice law after retirement from the bench. See Malmed v. Thornburgh, supra (applying rational basis scrutiny to forced retirement plan for state judges).

2. Analysis

Applied across the board to all judges, the challenged rule would obviously pass the test of rationality in relation to its ethical goals. The state Supreme Court could rationally have believed that law practice before and in association with courts and administrative bodies creates an appearance of impropriety. I find an obvious link between the rule and the maintenance of public confidence in the judicial process. Even if I did not, however, I would not be free to second-guess the factual assumptions of those who promulgated the rule. See, e.g., Minnesota v. Clover Leaf Creamery, 449 U.S. 456, 463, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981); Vance v. Bradley, 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979); Eatough, supra, 673 F.2d at 677 n. 5. Moreover, the legislative purpose is obviously an extremely important and weighty one, as recognized by both the state and federal courts. See discussion at p. 716, supra.
Nor is there any irrationality in applying higher standards to retired judges than to other retired government attorneys or employees. "`The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' Tigner v. Texas, 310 U.S. 141, 147 [60 S.Ct. 879, 882, 84 L.Ed. 1124] (1940). The initial discretion to determine what is `different' and what is `the same' resides in the legislatures of the States." Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).
The distinction between judges and nonlegal state employees is easily maintained. The purpose of the rulesmaintenance of public confidence in the judicial systemapplies only to the former. The promulgators of the rules could rationally have believed in the paramount importance of insulating the machinery of justice from improper influence. Similarly, the state Supreme Court could rationally have chosen to single out judges from other government attorneys for special ethical treatment.[13] Attorneys are charged with a duty of zealous representation. Such partiality, however, has no place on the bench. The rules are rationally related to the purpose of separating the roles of advocate and judge, both in fact and in the public perception. Thus the state Supreme Court, sitting adjudicatively, has recognized the peculiarly sensitive position of the judiciary, and upheld the "fundamental principle of disinterested justice which is the bulwark of our judicial system." In re Spitalnik, 63 N.J. 429, 431, 308 A.2d 1, 2 (1973). See also In re Vasser, 75 N.J. 357, 382 A.2d 1114 (1978); discussion at p. 716, supra.
Plaintiff also argues that, whatever the merits of a state policy of ensuring the integrity of the judiciary, the state has adopted an improper means of pursuing that policy. He attacks the rules because they apply only to judges currently receiving pensions:
The above restrictions on practicing law `before any of the courts of this state' are not applicable to any judges retiring or retired without pensions, of course, and are not applicable to retired judges who have waived their pension or *725 are awaiting receipt of deferred pensions.
To preclude misunderstanding insofar as possible, where the [statutory] practice restriction is applicable, the Supreme Court has directed publication and dissemination of the following guidelines: ....
Memorandum to Justices and Judges (Dec. 4, 1975). Plaintiff argues forcefully that the distinction between pensioned and unpensioned judges bears no relation to the ethical concerns underlying the ban. The receipt of a pension, he submits, does not increase the appearance or reality of a judge lending the prestige of his office to a partisan cause. He challenges the rationality of a distinction that may be circumvented simply by delaying receipt of the pension, a fact that would doubtless be unknown to the public. He asks whether receipt of a pension in any way transforms the honorable practice of lawas engaged in, for example, by his adversary the state Attorney General, who is a former state judgeinto an unethical act:
After long and arduous research we have found that the only difference ... is that on the first day of each month the wallet pocket of the pensioned [judge] bulges almost imperceptibly by the thickness of a pension check.
(Plaintiff's brief in opposition, p. 4). Such an arbitrary distinction, he argues, violates the state's minimum duty of rationality in treating like cases alike. Plaintiff's argument must be rejected. The state has carried its burden under equal protection law.
Defendant's initial brief largely established the importance of the state's interest in avoiding the appearance of impropriety in the judiciary. I am satisfied that that is an important state interest, as recognized by the Supreme Court, the Third Circuit, and the state Supreme Court. See cases cited at pp. 716-717, 720-721. Moreover, it is clear that the Supreme Court sought to prevent the improper use of judicial influence when it promulgated the rules and applied them to plaintiff's situation; I need not guess at the legislative purpose.
Plaintiff, however, points to Attorney General of Maryland v. Waldron, 289 Md. 683, 426 A.2d 929 (1981). In that case, the Maryland Court of Appeals struck down a state statute prohibiting the paid practice of law by pensioned judges. The court first struck down the statute on separation of powers grounds; it found that the legislature had invaded a province reserved to the Court of Appeals by the Maryland state constitution.[14] As an alternative ground, the court invalidated the pension/nonpension distinction under federal and state equal protection doctrine. The case is distinguishable.
First, the Maryland rule prohibited all legal employment and confined plaintiff to an $18,000 pension. It seems that "this onerous burden," 289 Md. at 716, 426 A.2d at 947, led the state court to heighten its level of scrutiny. In this case, plaintiff will receive a pension of $52,500 per year. The ban, moreover, extends only to certain forms of law practice while actually receiving benefits. Even assuming that the Waldron court properly heightened its scrutiny to protect a "vital" benefit, 289 Md. at 711, 426 A.2d at 944, I would not do so here. See also Tribe, supra, at 1090. The United States Supreme Court has applied rational basis scrutiny to laws discriminating in the distribution of basic subsistence benefits to the poor. See Schweiker v. Hogan, 457 U.S. 569, 593, 102 S.Ct. 2597, 2611, 73 L.Ed.2d 227 (1982) (upholding program extending medical aid to SSI recipients while withholding it from class containing more needy people); Dandridge v. Williams, 397 U.S. 471, 483-87, 90 S.Ct. 1153, 1160-62, 25 L.Ed.2d 491 (1970). I fail to see how the issue of the need to supplement a reasonable guaranteed annual income could raise more "vital" concerns demanding heightened scrutiny. Nor have Supreme Court *726 opinions arguably espousing such a theory ever done so in such a case. See Plyler v. Doe, 457 U.S. 202, 223-24, 102 S.Ct. 2382, 2398, 72 L.Ed.2d 786 (1982) (court may take into account the plight of children of illegal aliens denied an education); Murgia, supra, 427 U.S. at 319-21, 96 S.Ct. at 2569-70 (Marshall, J., dissenting) (forced retirement at age 50); Vance v. Bradley, 440 U.S. 93, 112-24, 99 S.Ct. 939, 950-56, 59 L.Ed.2d 171 (1979) (Marshall, J., dissenting) (forced retirement). Here there are no overtones of invidious discrimination and the deprivation is comparatively slight. Plaintiff may engage in a wide range of legal activities, or do nothing at all, and receive a considerable pension.[15] He may suspend receipt of his pension and take on the county counsel position. He is barred only from simultaneously taking the position and drawing his pension. Plaintiff's right, if any, to do so cannot invoke heightened scrutiny if the right to "basic subsistence" does not. Price, supra, 715 F.2d at 93. Certain Third Circuit dicta, later disapproved, id., suggested a heightened level of scrutiny for total denials of welfare benefits. See Medora v. Colautti, 602 F.2d 1149, 1153-54 (3d Cir.1979). The regulation here is more akin to a modest reduction, even assuming that the Medora dictum would apply. See Price, supra, 715 F.2d at 93.
Second, I am unable to adopt the Waldron holding because I am unsure of the level of scrutiny applied and the rationale therefor. The Maryland Court did not analyze the state and federal equal protection claims separately, but mixed the two. It thoroughly reviewed the federal cases on rational basis, intermediate, and strict scrutiny under the equal protection clause, but did not clearly settle on any particular level. The court referred to rational basis review, 289 Md. at 717, 426 A.2d at 948, but it understood intermediate scrutiny as included within that term. See 289 Md. at 711, 426 A.2d at 944. The Court strongly hinted that it was applying a heightened level of scrutiny falling short of strict scrutiny. See 289 Md. at 719-20, 426 A.2d at 949. It cited only Maryland state cases in support of that position. Id.[16] I have serious doubts whether the Maryland Court's holding rested on the federal constitution as expounded by the federal courts.
I also disagree with the Waldron court's analysis of the pension/nonpension distinction, on which plaintiff bases his argument. That court failed to find any reasonable basis for the legislative classification. Defendants here, however, adduce valid explanations for the distinction.
First, defendants note that pensioned judges are in effect on reserve status. Only judges receiving pensions are liable for recall to temporary active service on the bench.[17] N.J.S.A. 43:6A-13(b). The state Supreme Court might appropriately have concluded that the intermittent practice of law, interspersed by stints as a Superior Court Judge, raises unique ethical concerns. That situation is ethically nearly indistinguishable from the actual practice of law by a sitting judge, which is strictly prohibited by N.J.Ct.R. 1:15-1(a). Moreover, the two roles would be presented to *727 the public in close juxtaposition. The judge would not, as in the normal case, have put the advocacy role behind him and taken on the judicial role, or vice versa.
The relation between the measure in question and the goal of maintaining confidence in judicial integrity certainly meets the minimal "conceivability" test. See United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 178, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); McGowan v. Maryland, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 1104-05, 6 L.Ed.2d 393 (1961). Even heightened scrutiny, although not required, would not be fatal. See Fritz, supra, 449 U.S. at 180-82, 101 S.Ct. at 462-63 (Stevens, J., concurring) (certain sensitive cases should be examined only in light of actual or reasonable governmental purpose); id. at 193-98, 101 S.Ct. at 468-71 (Brennan, J., dissenting) (court should look for reasonable relation to actual purpose of rule).[18] Even applying the dissenters' test, I think the actual purpose of the rules is articulated and clear. The court adverted to the need to maintain public confidence by avoiding even the appearance of impropriety when it advised plaintiff that the regulations applied to his projected employment. See letter of November 3, 1982, quoted supra pp. 714-715. Provision for an "untainted" pool of reserve judges is rationally related to that purpose. See Malmed, supra, 621 F.2d at 572 (upholding mandatory retirement provision in part because recalling retired judges would be inexpensive means of reducing congestion of court calendar).
Second, there is a rough fairness in placing ethical demands on only pensioned judges. The state might feel more entitled to demand a quo where it has supplied a quid. The ethical restriction is not a bolt from the blue, but a condition attached to the receipt of a considerable benefit.[19] The state must treat similarly situated classes alike; recipients and nonrecipients of substantial pensions, however, are not similarly situated with regard to a measure that would restrict their ability to earn a living. Moreover, the conditions of the pension plan are known to all who voluntarily become, or remain, state judges. Such arguments of fairness may legitimately enter into the calculations of those promulgating rules restricting professions. Cf. City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (grandfather clause in ban on street vendors upheld in part because of reliance interest of the older vendors).
Third, and more fundamentally, the distinction has an independent justification. Defendants concede that the distinction between pensioned and unpensioned judges reflects not only ethical concerns, but a competing policy. In their view, the legislature, and later the Supreme Court, confined the application of the ethical ban to the class most able to bear the restriction. Pensioned judges, by virtue of the state's financial support, may more easily bear a partial restriction of their legal activities. The goal of ensuring financial support for retired judges competes with the ethical goals of the rules, and justifies some restriction of their scope.[20]
*728 The court need not fasten on a single purpose justifying a challenged rule. Kunkel v. United States, 689 F.2d 408, 417 (3d Cir.1982). See Malmed, supra (mandatory retirement age, though insufficiently related to goal of eliminating ineffective judges, advances other goals). Where a rule contains exceptions or qualifications, their validity may properly be based on a "secondary objective" of the legislation. Vance v. Bradley, 440 U.S. 93, 109, 99 S.Ct. 939, 948, 59 L.Ed.2d 171 (1973). Vance, for example, upheld a mandatory retirement age of 60 for Foreign Service officers. Although the restriction probably barred service by many competent officers, the Court found it to be justified "because it is in turn rationally related to the secondary objective of legislative convenience." Id. Receipt of a pension does not correlate perfectly with the class of retired judges with adequate financial support. "[M]athematical nicety," however, is not required. Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (quoting Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)). The restriction here is a convenient means of ensuring that the ethical rule works no undue hardship. This court may not consider whether the state Supreme Court would have been wiser to choose a restriction more closely related to its primary ethical objectives. See Vance, supra, 440 U.S. at 109, 99 S.Ct. at 948; Califano v. Jobst, 434 U.S. 47, 56-58, 98 S.Ct. 95, 100-01, 54 L.Ed.2d 228 (1977).[21]
Closely related is the often-cited principle that the equal protection clause does not prohibit the legislature from taking reform "one step at a time." E.g., Williamson v. Lee Optical, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1965); Katzenbach v. Morgan, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966). The rationale sometimes reflects the principle that a legislature may take a step in the right direction without penalty. See id. It also reflects the reality that all legislation must in some sense classify persons; where there is no "federal interest in equality" to the contrary, the legislative classification may stand. Clements v. Fashing, 457 U.S. 957, 973-76, 102 S.Ct. 2836, 2848-50, 73 L.Ed.2d 508 (1982) (Stevens, J., concurring). In the larger sense, the "one step at a time" rationale recognizes that, in cases involving no indicia of discrimination or abridgement of fundamental rights, legislative convenience or the need for experimentation may provide secondary rationales for limiting the scope of state enactments.[22] The secondary rationale may compete with and qualify the primary rationale of the enactment.
Underinclusive legislation, then, need not be invalid. In Railway Express Agency v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949), for example, the Court upheld a ban on advertisements on motor *729 vehicles which excepted advertisements promoting the product or services of the vehicle's owner. The legislature sought to promote safety by minimizing distraction on the roads. The appellant argued that the law was irrational because the "classification which the regulation makes has no relation to the traffic problem since a violation turns not on what kind of advertisements are carried on trucks but on whose trucks they are carried." 336 U.S. at 109-110, 69 S.Ct. at 465. Appellant, like plaintiff here, had a point. Yet, as the Court noted, that mode of equal protection analysis is "superficial," and ignores "practical considerations." Id. at 110, 69 S.Ct. at 465. The Court concluded that the legislature may have had some countervailing reason for building the exception into the statute:
And the fact that New York City sees fit to eliminate from traffic this kind of distraction but does not touch what may be even greater ones in a different category, such as the vivid displays on Times Square, is immaterial. It is no requirement of equal protection that all evils of the same genus be eradicated or none at all.
Id. See also Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (upholding environmentalist ban on plastic, but not glass or paper, containers).
In City of New Orleans v. Dukes, supra, the Court applied the Railway Express analysis to an underinclusive regulation whereby the city had banned street vendors in order to restore the original atmosphere of the historic Vieux Carre district. The ban contained a "grandfather clause" that effectively exempted a small number of vendors who had plied their trade in the district for over eight years. The Court upheld the regulation, stating and that the equal protection clause did not demand that the legislature choose between inaction and the elimination of the entire problem. The Court went on to state that the city could conceivably have respected the reliance interest of the older vendors, or could even have regarded the older vendors as more picturesque than the younger ones. 427 U.S. at 305, 96 S.Ct. at 2517.
Here, too, the court reviews a restriction on the activities of certain members of a profession. The restriction is less drastic than the Dukes regulation, as it bans only certain activities.[23] As in Dukes, the New Jersey rule is a step toward a worthy legislative goal; the state need not eradicate the entire evil at once. Moreover, the state can point to extremely plausible secondary purposes behind the limitation of the rule's scope, as it could not in Dukes.
Legislative distinctions are not per se invalid. Only discriminatory or totally arbitrary distinctions violate the equal protection clause. The New Jersey rule does not advance its ethical purposes in "so few" cases that it must be "wholly unrelated to the objective of the statute." Murgia, supra, 427 U.S. at 316, 96 S.Ct. at 2568. Moreover, the pension/nonpension distinction passes muster. Proffered justifications have included the possibility of recall; the need to provide a livelihood for retired judges and avoid undue economic hardship; and the basic quid pro quo fairness of the arrangement. Moreover, such distinctions may be inherently unobjectionable. See Clements v. Fashing, supra (Stevens, J., concurring); Dukes, supra. The extent to which the rule actually advances the cause of judicial ethics is not for this court to decide; the New Jersey Supreme Court may rationally have believed that it did. See, e.g., Dandridge, supra, 397 U.S. at 485, 90 S.Ct. at 1161; Murgia, supra, 427 U.S. at 316-17, 96 S.Ct. at 2568. See also Clements, supra (upholding restriction on justice of peace's candidacy for only certain elected positions). The wisdom of retaining or extending the rule is for the state authorities to decide; the federal constitution does not demand its abolition.
*730 Accordingly, defendants' motion for summary judgment is granted, and plaintiff's motion is denied. The administrative guidelines under which the New Jersey Supreme Court advised plaintiff that he could not accept the proffered position as county counsel are valid. I do not reach the issue of the validity of N.J.S.A. 43:6A-13(a).
NOTES
[1] Plaintiff in his brief does cast aspersions on the justifiability of the Supreme Court's application of its rules to his case. That is not, however, the basis of his claim. I do not reach the issue whether the state Supreme Court's advisory opinion to plaintiff that he could not ethically take on the county counsel position was a judicial act. While there was no courtroom proceeding, this does seem to have been an application of the law to the facts of a particular case. The Court's request for additional information about the nature of plaintiff's prospective employment further confirms that impression. See Coruzzi v. State of New Jersey, 705 F.2d 688, 690-91 (3d Cir.1983) (applying District of Columbia, supra, and finding that removal proceeding initiated against individual judge by state Supreme Court was judicial, not administrative, act).
[2] Pullman abstention, however, is generally without prejudice to the revival of plaintiff's federal constitutional claims in federal court after the state court determination. E.g. American Trial Lawyers Ass'n v. New Jersey Supreme Court, 409 U.S. 467, 469 & n. 4, 93 S.Ct. 627, 629 & n. 4, 34 L.Ed.2d 651 (1973); England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).
[3] The Court has very slightly relaxed the "pending" rule to include state proceedings initiated after a federal suit is filed, but before "proceedings of substance on the merits" have taken place in federal court. Hicks v. Miranda, 422 U.S. 332, 349, 95 S.Ct. 2281, 2292, 45 L.Ed.2d 223 (1975). That holding was clearly a narrow one, designed to avoid trivializing the principle of Younger by rewarding the winner of the race to the courthouse door.
[4] Burford itself was essentially a diversity case. The federal claims were not substantial and were not relied upon by the Court. Colorado River, supra, 424 U.S. at 815 n. 21, 96 S.Ct. at 1245 n. 21.
[5] Virtually all of the cases cited by defendant involved complex or novel issues of state law, and were decided on that basis. In Urbano v. Bd. of Managers, 415 F.2d 247 (3d Cir.1969), cert. denied, 397 U.S. 948, 90 S.Ct. 968, 25 L.Ed.2d 129 (1970), for example, the complaint had alleged mismanagement of a prison inmate trust fund. The federal court, sitting in diversity, declared itself unwilling to interpret a totally unexplored area of state law where it was not even sure of the rationale behind the program. It feared undercutting or embarrassing state policy. Id., 415 F.2d at 257. In Allegheny Airlines v. Pennsylvania Public Utility, 465 F.2d 237 (3d Cir.1972), cert. denied, 410 U.S. 943, 93 S.Ct. 1367, 35 L.Ed.2d 609 (1973), another diversity case, plaintiffs sought injunctive relief against the enforcement of certain airline regulations against them. Again, the court found that "early entry" of the federal court into an unexplored area of state law would needlessly interfere with the state's administration of its own laws. Id., 465 F.2d at 242.
[6] I also note that, although plaintiff requests both declaratory and injunctive relief, a judgment for plaintiff would need only encompass the former. A declaratory judgment implicates federalism concerns to a lesser degree than does an injunction directed against state officials. See Steffel, supra, 415 U.S. at 462-73, 94 S.Ct. at 1217-22 (declining to extend Younger to encompass declaratory judgment that would in effect head off threatened prosecutions). Steffel was an as-applied challenge; its reasoning applies even more strongly to the general constitutional challenge here. A judgment for plaintiff would leave the state free to regulate the bar within the confines of the federal constitution. Such a directive is no more offensive coming from a federal court than it would be from a state court.
[7] Thus plaintiff's related alternative argument that the Court rules go beyond the statutory mandate must fall as well. The Court, unlike an administrative agency, does not depend on statutory authorization for its rulemaking power. The power derives directly from the state constitution.

Plaintiff rightly does not press any federal claim based on separation of powers. "Whether the legislative, executive and judicial powers of a State shall be kept altogether distinct and separate ... is for the determination of the State. And its determination one way or the other cannot be an element in the inquiry whether the due process of law prescribed by the Fourteenth Amendment has been respected by the State ...." Dreyer v. Illinois, 187 U.S. 71, 84, 23 S.Ct. 28, 32, 47 L.Ed. 79 (1902). See also Highland Farms Dairy v. Agnew, 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937) (distribution of power in state government a state law matter).
[8] I am indebted to defense counsel for the following survey of judicial pension provisions in other states, which I quote in full:

Research has disclosed that similar provisions are in effect in both South Carolina and Virginia. See S.C.Code Ann. § 9-8-120(4); Va.Code Ann. § 51-179. The Virginia statute provides that no former full-time judge receiving judicial retirement benefits "shall appear as counsel in any case in any court" of the State. The South Carolina Statute provides that no judge or justice receiving retirement compensation "shall engage in the practice of law if such practice shall involve appearing in the courts of the State before a jury, administrative tribunal or judge or involve appearing before the Supreme Court of this State." The constitutionality of the Virginia statute is presently the subject of litigation in the United States District Court for the Eastern District of Virginia under the caption of Thompson v. Walker, 583 F.Supp. 175 (1984). In addition, the relevant Georgia statute provides that any judge or solicitor of an inferior court "may not engage in the private practice of law while receiving retirement pay unless he was authorized to engage in the private practice of law while first actively serving as judge or solicitor," and thus completely prohibits the practice of law by the former judges to which it applies. Ga.Code Ann. § 78-1323.1. The applicable Missouri statute provides that any retired judge receiving a pension "may engage in the practice of law or do law business at any time after his retirement if he makes himself available to serve as appointed defense counsel for indigent persons who may be charged with a violation of any of the criminal laws of this State." Mo.Stat.Ann. § 476.565. Finally, both California and West Virginia prohibit the private practice of law by retired judges receiving a pension if their retirement was caused by disability. Cal.Gov't Code Ann. § 75080; W.Va.Code Ann. § 51-9-7.
In addition, the compliance provisions of the Model Code of Judicial Conduct proposed by the American Bar Association, which has been adopted in the proposed form in ten States, provide that the restriction of Canon 5(F) providing that "a judge should not practice law" shall apply to retired judges if they are eligible for recall and are receiving the same salary as a full-time judge from the court from which they retired. The New Jersey Code of Judicial Conduct, however, specifically exempts retired judges from compliance with Canon 5(F).
[9] See McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948) (ancestry). Certain "quasi-suspect" classes have received an intermediate level of scrutiny. See, e.g., Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (sex); Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (legitimacy).
[10] See, e.g., Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (voting); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (interstate travel); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (criminal appeal); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). See also Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (striking down prohibition on purchase of contraceptives by unmarried persons).
[11] "It has been estimated that the Supreme Court invalidated state or federal regulations pursuant to the due process clause, usually coupled with another provision such as the equal protection clause, in 197 cases between 1899 and 1937, while an even larger number of regulations survived scrutiny." L. Tribe, American Constitutional Law § 8-2, at 435 n. 2 (1978) (collecting authorities). By contrast, since 1937 the Supreme Court has apparently struck down only one economic measure under the equal protection clause. See Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), overruled by New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).
[12] But see Leis v. Flynt, 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (where state law does not create a property interest in practice of law, no hearing required for denial of out-of-state attorney's request for admission to practice pro hac vice).
[13] In the rational basis area, distinctions between various professional groups have frequently been upheld. See Clements v. Fashing, 457 U.S. 957, 968 n. 5, 102 S.Ct. 2836, 2846 n. 5, 73 L.Ed.2d 508 (1982) (plurality opinion) ("The State's particular interest in maintaining the integrity of the judicial system could support § 19 [as to a Justice of the Peace], even if such a restriction could not survive constitutional scrutiny with regard to any other officeholder); Williamson v. Lee Optical, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1965) (rule applied to opticians, but not sellers of ready-to-wear glasses); Semler v. Oregon State Bd. of Med. Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935) (advertising restriction applicable only to dentists). The state may "deal with the different professions according to the need of the public in relation to each." Id. at 610, 55 S.Ct. at 571. See also Eatough, supra (osteopaths/foreign medical school graduates).
[14] As noted above, the court rules challenged here do not violate New Jersey separation of powers principles.
[15] The present version of the New Jersey Judicial Retirement System provides for a pension at the rate of three quarters of the judge's final salary in the case of ordinary retirement. N.J. S.A. 43:6A-5. Ordinary retirement is available after as little as 10 years of service for a judge who is 70 years old, with longer service requirements for earlier retirements. N.J.S.A. 43:6A-8. For judges who have not accumulated the required years of service, lower pension rates apply. E.g. N.J.S.A. 43:6A-8; id. 6A-9; id. 6A-10; id. 6A-11. Disability pensions at three quarters salary are available, id. 6A-12. Pensions are adjusted to reflect rises in the Consumer Price Index. Id. 3B-1 et seq. The Judicial Retirement System, both in absolute terms and relative to salary, is far more generous than other state employee retirement plans. See, e.g., N.J.S.A. 43:15A-1 et seq. (public employees); id. 18A-66-1 et seq. (teachers).
[16] It also cited United States Supreme Court cases dealing with employment terminations and procedural due process. 289 Md. at 721, 426 A.2d at 950. No such claim is raised here.
[17] Recall is subject to the consent of the judge. Recalled judges are entitled to per diem compensation, provided that the payments, added to the judge's pension, do not exceed a full-time judge's salary. N.J.S.A. 43:6A-13.
[18] This Circuit, examining recent Supreme Court precedent, has made it clear that no showing of actual legislative purpose is required. Price, supra, 715 F.2d at 94; Murillo, supra, 681 F.2d at 908-09 n. 20; Eatough, supra, 673 F.2d at 676 n. 4.
[19] The Court has in many contexts cast a skeptical eye on constitutional challenges to programs under which plaintiff simultaneously claimed a benefit. Arnett v. Kennedy, 416 U.S. 134, 152-53, 94 S.Ct. 1633, 1643-44, 40 L.Ed.2d 15 (1974) (plurality). Plaintiff may have to "take the bitter with the sweet." Id. at 154, 94 S.Ct. at 1644. Cf. Grove City College v. Bell, ___ U.S. ___, 104 S.Ct. 1211, 1223, 79 L.Ed.2d 516 (1984) (rejecting first amendment challenge, since Congress may attach conditions to optional aid program); Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981).
[20] Significantly, the legislature's original prohibition of practice "before the courts" was enacted as part of the pension plan. Clearly the legislature had both ethical and pension policies in mind. The Supreme Court, while exercising its inherent power, quoted the legislative proscription in promulgating the rule challenged here. While the Court has no responsibility for compensating retired judges, there is no reason that it may not take that goal into account in promulgating its rules. Indeed, the Court seemed to assume the propriety of doing so; it accommodated the legislature by applying its own guidelines only "where the [legislative] practice restriction is applicable ...." (Memorandum to Judges and Justices) (Dec. 4, 1975).
[21] State court cases have accepted the secondary "hardship" rationale. In Green v. Hart, 44 Mich.App. 259, 205 N.W.2d 306 (1972), the court upheld a statute that prohibited only full-time judges from the private practice of law. The court justified the distinction by noting that part-time judges did not receive full-time salaries. Accord, Babineaux v. Judiciary Commission, 341 So.2d 396, 401 (La.1976).

Discussing the state's need for additional part-time judicial officers as justifying mandatory retirement, the Third Circuit has noted the "the legislature could consider the state judicial pensions available to most state judges. This is additional compensation available to senior judges but not available to active judges." Malmed, supra, 621 F.2d at 573 n. 14.
[22] Even in Katzenbach, supra, a case that would seem to involve the fundamental right to vote, a close reading reveals that the Court found close scrutiny inappropriate. 384 U.S. at 657, 86 S.Ct. at 1727. The Court emphasized that the statute in question extended the right to vote where it had previously been denied; that the statute might have gone further did not implicate fundamental rights. The Court distinguished the case of "laws denying fundamental rights." Id. (emphasis in original). See Tribe, supra, at 997 (underinclusive legislation very rarely struck down).
[23] Indeed a court applying strict scrutiny might require such restriction in order that the means might be narrowly tailored to the state purpose.